IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ROCKY MOUNTAIN CLEAN AIR ACTION, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 06-01992 (JR) |
| STEPHEN L. JOHNSON, Administrator, United States Environmental Protection Agency | ) ) ) ) ) ) | |
| Defendant. | ) ) | |

## PLAINTIFFS' MOTION FOR AWARD OF ATTORNEYS' FEES AND COSTS, AND MEMORANDUM IN SUPPORT

**I.    INTRODUCTION**

Pursuant to the citizen suit provision of the Clean Air Act, 42 U.S.C. § 7604(d), Plaintiffs Rocky Mountain Clean Air Action and Jeremy Nichols ("Citizens") hereby requests an award of attorneys' fees and costs for this litigation in the amount of $9,229.78.  This case compelled United States Environmental Protection Agency Administrator Stephen L. Johnson ("EPA") to correct violations of the Clean Air Act related to EPA's failure to grant or deny Citizens' petitions filed under Title V of the Clean Air Act, 42 U.S.C. § 7661d(b)(2), within the mandatory 60-day timeline provided by the Clean Air Act.  EPA's failure to respond to Citizens' Clean Air Act Title V petitions is part of EPA's long standing pattern and practice of willfully violating the 60-day mandatory deadline in 42 U.S.C. § 7661d(b)(2) until at least a complaint is filed in federal court.  In this case, EPA did not respond to Citizens' petition until well over a

year passed from the mandatory 60-day deadline for EPA to respond to the Title V

petitions.  Moreover, EPA did not respond until after Citizens sent 60-day notice of intent

to sue letters, waited over 60 days, and then filed the Complaint in this case.

EPA has stipulated that Citizens are entitled to recover their attorneys' fees and

costs for this action pursuant to 42 U.S.C. § 7604(d).  See Docket No. 15.  EPA has also

stipulated that Citizens are entitlement to $388.28 in out of pocket expenses, which is the

amount that Citizens are seeking.  Id.

However, Citizens and EPA were not able to come to agreement on the

appropriate hourly rate for fee recovery for Citizens' attorneys, nor on the reasonable

amount of time expended by Citizens' attorneys.  Citizens submitted detailed billing

records to EPA and a proposal to resolve the fee and cost award without use of further

judicial resources.  Despite the relatively modest amount of fees and costs sought by

Citizens at that time, and the Supreme Court's caution that a "request for attorney's fees

should not result in a second major litigation," Hensley v. Eckerhart, 461 U.S. 424, 437

(1983), Citizens and EPA were unable to settle the issue of fees.  Thus it is appropriate

for the Court to resolve the issue of fees at this time, with the issues before the Court

narrowed to: (a) the appropriate hourly rate to use in calculating attorneys fees for

Citizens' attorneys and (b) the reasonable number of hours expended by Citizens'

attorneys.


## II.     SUMMARY OF ARGUMENT

Fee-shifting is key to strong environmental enforcement.  The purpose of private

attorney general fee-shifting statutes, like the Clean Air Act's, is to encourage

competent, skilled attorneys to take on Clean Air Act cases and in doing so, enforce the

Clean Air Act which is "Congress's response to well-documented scientific and social

concerns about the quality of the air that sustains life on earth and protects it from . . .

degradation and pollution caused by modern industrial society." Delaware Valley

Citizens Council for Clean Air v. Davis, 932 F.2d 256, 260 (3rd Cir. 1991). To

accomplish that purpose, attorneys who win such cases must be paid for all of their

reasonable efforts at the same level as their counterparts in the commercial market. See

Hensley, 461 U.S. at 430, n.4; Blum v. Stenson, 465 U.S. 886, 893-94 (1984). Without

the promise of a fully compensatory fee award, competent, skilled attorneys are less

likely to take these cases and enforcement of this critical public health and welfare statute

will be diminished.

     In the instant case, Citizens seeks 30.5 hours of lawyer time and 5.6 hours of law

clerk time, which represents a 15% self-imposed deduction in the already small billable

hours expended in Citizens' effort to preserve the goals of the Clean Air Act. See

Declaration of Robert Ukeiley ("Ukeiley Decl.") ¶¶ 12-13. Had it not been for Plaintiffs'

counsel commitment and dedication, the protections of the Clean Air Act would have

gone unenforced. Having fulfilled the Clean Air Act's purposes, Citizens' attorneys now

are entitled to an award of reasonable attorneys' fees that compensates them in full for

their efforts.

     EPA's principle objection seems to be that because one of Citizens' counsel,

Robert Ukeiley, lives in Kentucky, he and his associate, law clerk and paralegal should

not be compensated at the forum hourly rate derived from the U.S. Department of

Justice's own "Laffey" Matrix for reasonable rates in the District of Columbia. EPA's

argument represents a sudden and unexplained reversal of the U.S. Department of Justice's long standing approach of both settling cases in which Ukeiley is counsel based on the Laffey Matrix rate, and raising no objection to the use of Laffey Matrix rates even when fee awards are contested before the courts. EPA's argument will apparently be based on a misguided attempt to apply the facts of this case to <u>Davis County Solid Waste Mgmt. v. EPA</u>, 169 F.3d 755, 758 (D.C. Cir. 1999). Ukeiley actually charges and is paid by clients based on the Laffey Matrix rates. Therefore, <u>Davis</u>, which was about a client receiving a windfall because it paid its Salt Lake City-based lawyers substantially less than the going D.C. rates, has no applicability here. Furthermore, Ukeiley lives in Kentucky but does not really have a Kentucky law practice. If anything, it would be most accurate to describe Ukeiley's practice as a highly specialized national or even federal court D.C. practice.

EPA may also argue that Ukeiley should be penalized because he represented Citizens in this case on a *pro bono* basis and that his public interest environmental law practice does the majority of its work on a *pro bono* basis. The D.C. Circuit and other courts have soundly rejected this anti-public interest argument, which if adopted would undercut the very purpose of the federal fee-shifting statutes.

Finally, EPA may try to "nickel and dime" Plaintiffs on the reasonable hours compensable for this case. EPA's argument will likely be based not on evidence, but rather on the opinion of EPA's trial counsel. For this reason alone, the argument must fail. In any event, Plaintiffs' counsel's decision to exercise their billing discretion to reduce their billable hours by 15% should completely moot this argument.

4

As a result of Plaintiffs' counsel's efforts, Citizens have halted the EPA's ongoing violation of the Clean Air Act, requiring the EPA to fulfill its federal oversight role in implementing the Clean Air Act to control emission from major sources of pollution.  In doing so, Citizens have ensured that the requirements of the Clean Act have been fulfilled in this case.  These results compel a fee that fully compensates Citizens' counsel for their diligent and efficient lawyering.  Citizens' counsel have performed a valuable public service.  If they, and others like them, are to be able to enforce our Nation's vital environmental laws in the future, they must be fully compensated for those efforts.  That is all Citizens seek by this motion.

## III.    FACTS

### A.    Background on the Clean Air Act

The Clean Air Act aims "to protect and enhance the quality of the Nation's air resources." 42 U.S.C. § 7401(b)(1).  To help meet this goal, the 1990 amendments to the Clean Air Act created an operating permit program that applies to all major sources of air pollution – the Title V permit program.  <u>See</u> 42 U.S.C. §§ 7661-7661f.

A primary purpose of the Title V permitting program is to reduce violations of the Clean Air Act and improve enforcement by recording in one document all of the air pollution control requirements that apply to a major source of air pollution. <u>See</u> <u>New York Public Interest Research Group v. Whitman</u>, 321 F.3d 316, 320 (2d Cir. 2003). Major sources of air pollution cannot legally discharge pollutants into the air unless they have a valid Title V operating permit. 42 U.S.C. § 7661a(a).

The Clean Air Act provides that the Administrator of EPA may approve states' programs to administer the Title V permitting program with respect to sources within their borders. 42 U.S.C. § 7661a(d).  The Colorado Department of Public Health and the Environment is responsible for issuing Title V permits in Colorado.  The South Dakota Department of Environment and Natural Resources is responsible for issuing Title V permits in South Dakota.

Before a Title V permit can be issued by a state permitting agency with an approved Title V permit program, the state permitting agency must forward the proposed Title V permit to EPA. 42 U.S.C. § 7661d(a)(1)(B).  EPA then has 45 days in which it can review the proposed permit.  EPA must object to the issuance of the permit if EPA finds that the permit does not comply with all applicable provisions of the Clean Air Act. 42 U.S.C. § 7661d(b)(1).  However, as a practical matter, EPA does not review most proposed Title V permits forwarded to it by state permitting agencies.  See Ukeiley Decl. at ¶ 55.  After EPA's 45-day review period, "any person may petition the Administrator within 60 days" to object to the Title V permit. 42 U.S.C. § 7661d(b)(2).  Once it receives a petition for objection to a Title V permit, EPA must grant or deny that petition within 60 days. Id.; New York Public Interest Research Group v. Whitman, 214 F. Supp. 2d 1, 2 (D.D.C. 2002).

EPA's record of compliance with the mandatory 60-day deadline in 42 U.S.C. § 7661d(b)(2) is abysmal.  In almost every single case, EPA does not respond to a Title V petition until after a citizen suit has been filed to force compliance with this mandatory duty.  See Ukeiley Decl. at ¶ 54.  Thus, there are some petitions filed in 1998 which, according to EPA's own web page, EPA has yet to respond to, despite the passage of

closing in on a decade beyond the 60-day deadline.  See e.g.

http://www.epa.gov/region7/programs/artd/air/title5/petitiondb/petitiondb1999.htm (last

visited on June 15, 2007).

> **B.** **The Instant Action**

This case involves two Title V petitions.  The first petition involves a power plant

in Colorado called Ft. St. Vrain Power Station (Ft. St. Vrain).  Operation of the Ft. St.

Vrain Station releases nitrogen oxides, carbon monoxide, particulate matter, volatile

organic compounds, and hazardous air pollutants, all of which have been identified by the

EPA as reasonably anticipated to endanger public health and welfare.  The Ft. St. Vrain

Station has the potential to release 2,447,800 pounds of nitrogen oxides per year,

2,392,200 pounds of carbon monoxide per year, and 296,600 of particulate matter less

than 10 microns in size per year.

On August 6, 2005, Plaintiff Jeremy Nichols submitted a petition to EPA

requesting that EPA object, pursuant to Title V of the Act, 42 U.S.C. § 7661d(b)(2), to

the Ft. St. Vrain Title V permit issued by the Colorado Department of Public Health and

the Environment.  In summary, the petition raised six issues with respect to the legality of

the Ft. St. Vrain Station Title V permit: (1) failure to require Best Available Control

Technology (BACT) for emissions of nitrogen oxides; (2) failure to set and ensure

compliance with enforceable nitrogen oxide limits; (3) failure to meet compliance

assurance monitoring requirements; (4) failure to require opacity monitoring; (5) failure

to set and ensure compliance with enforceable carbon monoxide limits; and (6) flaws in

other permit conditions warranting an objection.

The second petition involves a coal-burning cement manufacturing facility in South Dakota called GCC Dacotah.  The manufacturing of cement at GCC Dacotah results in emissions of mercury, carbon dioxide, particulate matter, sulfur dioxide, nitrogen oxides, volatile organic compounds, and carbon monoxide.  The plant has the potential to emit 55,167 tons per year, or over 110 million pounds per year, of particulate matter less than 10 microns in size.  According to the EPA, particulate matter less than 10 microns in size is small enough to get into human lungs and causes respiratory ailments and asthma attacks.  The amount of NOx released by the plant is equivalent to the emissions of 223,246 cars each driven 12,500 miles per year (according to the EPA, an average vehicle emits 38.2 pounds of NOx per year).

On January 18, 2006 EPA received from Plaintiffs Rocky Mountain Clean Air Act and Jeremy Nichols, as well as Biodiversity Conservation Alliance, Defenders of the Black Hills, Native Ecosystems Council, Prairie Hills Audubon Society of Western South Dakota, Center for Native Ecosystems, Nancy Hilding, and Brian Brademeyer, a petition requesting that EPA object, pursuant to Title V of the Act, 42 U.S.C. § 7661d(b)(2), to the GCC Dacotah Title V permit issued by the South Dakota Department of Environment and Natural Resources.  The petition raised four primary issues with respect to the GCC Dacotah cement plant Title V permit: (1) failure to require Best Available Control Technology (BACT) for $SO_2$, $PM_{10}$, NOx, and CO emissions; (2) failure to require sufficient particulate matter monitoring to ensure compliance with MACT standards; (3) failure to require prompt reporting of permit deviations; and (4) problems with six other permit conditions.

As noted above, EPA is required by the Clean Air Act to respond to all petitions under 42 U.S.C. § 7661d(b)(2) within 60 days. 42 U.S.C. § 7661d(b)(2). Thus, EPA was required to respond to the Ft. St. Vrain petition by no later than October 8, 2005 and to the GCC Dacotah petition by no later than March 19, 2006. EPA did not issue any response within the mandatory 60-day deadlines, thus commencing EPA's unlawful failure to perform its mandatory duty in this case.

On October 11, 2005, Citizens sent a notice letter to EPA under § 304(b)(2) of the Act, 42 U.S.C. § 7604(b)(2), stating Citizens' intent to file suit to compel a response to Citizens' Title V petition regarding Ft. St. Vrain. On March 21, 2006, Citizens sent a notice letter to EPA under § 304(b)(2) of the Act, 42 U.S.C. § 7604(b)(2), stating Citizens' intent to file suit to compel a response to Citizens' Title V petition regarding GCC Dacotah. EPA received these notice of intent to sue letters but EPA did not issue a response to Citizens' petitions, nor even make an offer to issue a response to Citizens' petitions, within the 60-day time period required by the Clean Air Act before commencement of a citizen suit.

Thus, on November 21, 2006, Citizens filed the Complaint in this matter. On January 16, 2007, even before EPA had answered, Citizens once again contacted EPA and also contacted the U.S. Department of Justice Environmental Defense Section seeking to resolve this matter.[1] On February 5, 2007, almost a one year and four months past the mandatory 60-day deadline, EPA signed an order granting in part and denying in part Mr. Nichols' Title V petition regarding Ft. St. Vrain. The parties continued to

---

[1] Undersigned counsel's experience is that contacting EPA and US DOJ sooner than six weeks after the complaint is served is usually not productive as EPA and US DOJ are not prepared to discuss the matter at that stage.

negotiate a settlement which ultimately resulted in the Court entering a consent decree on

May 17, 2007 resolving all issues except the issue of costs of litigation, including

attorneys' fees.  On June 15, 2007, pursuant to the Court's consent decree, EPA signed an

order granting in part and denying in part Citizens' Title V petition regarding GCC

Dacotah.

Meanwhile, the parties tried to negotiate a settlement of the costs of litigation,

including attorneys' fees.  However, the parties were not able to reach a settlement with

the major "sticking" point being reasonable hourly rates for Citizens' attorneys.  The

parties were able to reach a stipulation that Citizens' are entitled to attorneys' fees

pursuant to 42 U.S.C. § 7604(d) and are entitled to out of pocket expenses in the amount

of $388.28.  See Docket No. 15.  Thus, the only the issue left for resolution is the

reasonable amount of attorneys' fees Citizens are entitled to, which consists of the two

sub-issues of the reasonable hourly rate for Citizen's counsel and their staff and the

reasonable number of billable hours.

## IV.    ARGUMENT

### A.    Citizens Is Entitled To Recover Fees

As mentioned above, EPA has stipulated that Citizens are entitled to an award of

costs of litigation, including attorneys' fees, pursuant to Clean Air Act § 304(d), 42

U.S.C. § 7604(d).  That provision provides:  "[t]he court, in issuing any final order in any

action brought pursuant to subsection (a) of this section, may award costs of litigation

(including reasonable attorney and expert witness fees) to any party, whenever the court

determines such award is appropriate."  Id.  An attorneys' fee award is "appropriate" to

parties who "prevail" or "prevail in part": *i.e.*, who achieve "some degree of success on the merits." Ruckelshaus v. Sierra Club, 463 U.S. 680, 689, 694 (1982). Citizens have met both prongs of this test, having obtained all the substantive relief sought by obtaining EPA's decisions on Citizens' Title V petitions.

**B.    Hourly Rate[2]**

1.    Plaintiff's Counsel and Staff from the Law Office of Robert Ukeiley are Entitled to an Hourly Rate based on the Laffey Matrix Despite the Fact that Ukeiley lives in Kentucky.

The amount of fees Citizens are requesting is calculated by the "lodestar" method: reasonable hourly rates multiplied by the number of hours reasonably spent on the litigation. See Blanchard v. Bergeron, 489 U.S. 87, 94 (1989). The hourly rate requested by Citizens here is based on the "Laffey Matrix" as calculated by the U.S. Department of Justice. See Ukeiley Decl., ¶ 57 and Ex. D (District of Columbia U.S. Attorney Office Laffey Matrix webpage). In this Circuit, it is well established that hourly rates for purposes of awards under fee-shifting statutes may be calculated based on the rates set

---

[2] This same issue, that is Ukeiley's and his staff's reasonable hourly rates is currently being litigated in another Title V petition deadline suit in this Court, MacClarence v. Johnson, 07-cv-00055 (RWR). Furthermore, this Court has previously held in another environmental citizen suit that Ukeiley's and his staff's reasonable hourly rates could be based on the U.S. Attorney's Office Laffey Matrix although there was a 5% reduction, based on numerous factors, and it is not clear if the 5% was to the hourly rate or the number of hours because it was deducted from the total, that is the loadstar. See Center for Biological Diversity v. Norton, 04-cv-00156 (JDB) January 26, 2005 Order at ftnt 3 attached to Ukeiley Decl. at Ex. B.

EPA may argue that the Norton decision is of no moment because in that case the U.S. Department of Justice attorney did not argue that Davis County Solid Waste Mgmt. v. EPA, 169 F.3d 758 (D.C. Cir. 1999) precludes the use of Laffey Matrix rates for Ukeiley and his staff. It is true that the U.S. Department of Justice attorney did not make that argument, presumably because he realized the argument was frivolous. He was certainly aware of the Davis case as he cited it in his brief on the fees issue. See Federal Defendant's Opposition to Plaintiffs' Motion for Attorneys' Fees and Costs at 11.

forth in Laffey v. Northwest Airlines, Inc., 746 F.2d 4 (D.C. Cir. 1984), for 1981-82, as

adjusted by changes in Consumer Price Index for the Washington, D.C. Metropolitan

area.  See, e.g., Covington v. District of Columbia, 57 F.3d 1101, 1105 & n. 14, 1109

(D.C. Cir. 1995), cert. denied, 516 U.S. 1115 (1996); Northwest Coalition for

Alternatives to Pesticides v. EPA, 421 F.Supp.2d 123, 129 (D.D.C. 2006) (awarding fees

and noting: "[Plaintiff] requests, and defendant does not oppose, that hourly fees be

calculated under the Laffey Matrix"); Cobell v. Norton, 407 F.Supp.2d 140, 169-170

(D.D.C. 2005) (awarding fees at Laffey Matrix rates under lodestar method); Judicial

Watch v. Department of Commerce,  384 F.Supp.2d 163, 170 (D.D.C. 2005), aff'd in part

and rev'd in part on other grounds 470 F.3d 363 (2006) (awarding fees and noting:

"[Defendant] does not oppose the use of the Laffey Matrix to determine the rates owed to

Judicial Watch and the Court finds the rates to be reasonable.").

As the Court of Appeals has explained, Laffey Matrix rates are within the market

rates for attorneys of comparable experience doing comparable work.  See Covington, 57

F.3d at 1109 ("In order to demonstrate [the market rate], plaintiff may point to such

evidence as an updated version of the Laffey matrix or the U.S. Attorney's Office

matrix").  A copy of the Laffey Matrix available from the U.S. Attorney's Office for the

District of Columbia (updated for the years 2003-2007) is filed as Exhibit D to the

Ukeiley Declaration.  Ukeiley Decl. ¶ 57 and Ex. D.  The rates to be used are the rates

which were in effect for each year in which the work was performed.  See Masonry

Masters, Inc. v. Nelson, 105 F.3d 708, 710 (D.C. Cir. 1997).

The correct legal market for calculating the award in this case is the Washington,

D.C. market:

> The proper rule is that the relevant community is the one in which the
> district court sits.  This is a simple rule to follow.  It requires the district
> court normally to determine only the prevailing market rate within its
> jurisdiction, an inquiry about which it should develop expertise.  Moreover,
> it is a neutral rule which will not work to any clear advantage for either
> those seeking attorneys' fees or those paying them.

Donnell v. U.S., 682 F.2d 240, 251 (D.C. Cir. 1982), cert. denied 459 U.S. 1204 (1983)

(in voting rights case, awarding D.C. rates for Mississippi-based counsel, except for one

attorney who solely participated due to his knowledge of local conditions in Mississippi).

In a later decision, the Court of Appeals confirmed the general rule set forth in Donnell

(that market rates in Washington, D.C. area are to be used in the Lodestar calculation of

fee awards in this District), but adopted a narrow exception "where the bulk of the work

is done outside the jurisdiction of the court *and* where there is a *very significant*

difference in compensation favoring D.C."  Davis County Solid Waste Mgmt. v. EPA,

169 F.3d 755, 758 (D.C. Cir. 1999) (emphasis in original).  In Davis, the prevailing

plaintiff sought recovery of attorney fees at D.C. rates for their Utah counsel – rates

which were about 70% higher than the firm's Utah rates.  The basis for this new

exception in Davis was to "prevent the occasional erratic result where the successful

petitioner is vastly overcompensated given the amount he contracted to pay for legal

services.  In all other cases the D.C. forum rates would apply."  Id.  The Davis decision

was plainly tied to the "extreme situation" presented by the facts of that case:  "We think

the neutrality rationale in Donnell is still sufficient to justify forum rates in all but the

**extreme situation** we face here."  Id. at 759.  (emphasis added).[3]

---

[3] The Davis decision, based on the rationale of preventing a windfall to a successful
plaintiff, is contrary to the Supreme Court's decision in *Missouri v. Jenkins*, 491 U.S.
274, 287 (1989) which rejected the anti-windfall rationale.  ("Neither petitioners nor
anyone else, to our knowledge, has ever suggested that the hourly rate applied to the
work of an associate attorney in a law firm creates a windfall for the firm's partners or is

Applying the rules to the case at bar, Robert Ukeiley is entitled to $360 per hour for work done prior to May 31, 2006 and $375 per hour for work after June 1, 2006, which is the rate provided for him in the U.S. Attorney Office for the District of Columbia's adjusted Laffey Matrix.[4]  The D.C. Circuit has explained that there are at least three factors to consider in determining a reasonable rate; billing practice of a lawyer, the lawyer's experience, skill and reputation and the prevailing market rate. Covington, 57 F.3d at 1107.

Turning first to his billing practice, Ukeiley has a 100% public interest for-profit practice.  He only represents groups or individuals in enforcing federal environmental laws or state laws or regulations implementing federal environmental laws.  His practice only seeks injunctive or declaratory relief or civil penalties that go to the federal treasury rather than the plaintiffs.[5]  Ukeiley's practice focuses predominately on the Clean Air Act with a lesser focus on the Endangered Species Act.  Ukeiley's practice predominately involves representing non-profit organizations, with the occasional individual named as a co-plaintiff, although on rare occasions, the practice does involve representing public interest minded individuals.  Ukeiley Decl. ¶¶ 21-22.

---

otherwise improper under § 1988, merely because it exceeds the cost of the attorney's services.  If the fees are consistent with market rates and practices, the "windfall" argument has no more force with regard to paralegals than it does for associates.")  However, the Court need not address the legal validity of Davis because it is factually distinguishable from the present case where Plaintiffs was represented on a *pro bono* basis so that they can have no windfall between what they paid and what they recovered.  In addition Plaintiffs' counsels' actual rates are at or close to the U.S. Attorney's Office's revised Laffey Matrix rates.

[4] Mr. Ukeiley is using his billing discretion to request no more than $375 per hour, even for work done after May 31, 2007 for which the U.S. Attorney's Office's revised Laffey Matrix would provide a higher rate.

[5] This is not to imply that monetary damages cannot serve the public interest.

Ukeiley's practice involves charging "variable rates (both at and below the market, with the latter attributable to public-spirited goals)" of maximizing environmental and public health protection.  See Covington, 57 F.3d at 1108.  Ukeiley represents labor unions and individual members of labor unions regarding Clean Air Act permits issued by the Indiana Department of Environmental Management.  In these matters, Ukeiley charges a rate based on the Laffey Matrix.  Ukeiley charges his market rate to these clients because he believes charging this rate will not affect the degree of environmental protection, considering the relative resources available to the labor unions.  Between incorporating his present law firm in December of 2003 and June 21, 2007, Ukeiley has worked on 14 of these matters.  He has billed and collected over $66,000 at Laffey Matrix rates for this work.  These are not fee shifting matters so the client is paying Ukeiley's market rate with no ability to recoup these fees.  This represents a substantial portion of the firm's total income during that period because of the firm's public interest nature.  Ukeiley Decl. ¶¶ 23-25.

The rate is based on the Laffey Matrix because in reality, Ukeiley's firm has a nationwide practice but the majority of its work is in D.C. federal courts.  For example, as of June 21, 2007, the firm currently had 16 cases in active litigation.  Of these 16 cases, nine are in this Court (the U.S. District Court for the District of Columbia), one is in the U.S. Court of Appeals for the District of Columbia Circuit, one is in the U.S. District Court for the Northern District of Georgia, one is in the U.S. District Court for the Southern District of Ohio, one is in front of an Administrative Law Judge of the Kentucky Environment and Public Protection Cabinet, one is in the Pennsylvania Supreme Court, one is in the United States Court of Appeals for the Eleventh Circuit, and

one is in the Franklin County, Kentucky Circuit Court. However, in the Franklin County

Circuit Court, there is a Kentucky lawyer who serves the role of local counsel in this

case. Ukeiley is involved in this last case, as well as the case in front of the Kentucky

Administrative Law Judge because the cases involve Clean Air Act challenges to coal

fired power plants, which is Ukeiley's specialty. He represents the Sierra Club in these

two cases. The Sierra Club is a nation-wide environmental organization based in San

Francisco, California. Thus, Ukeiley's practice is issue-based rather than location-based.

Ukeiley lives in Kentucky simply for personal reasons. Ukeiley Decl. ¶¶ 26-27.

   Ukeiley's bar membership also reflects the nation wide scope of his practice.

Ukeiley is admitted to the Maryland (inactive status), Colorado (inactive status), Georgia

and Kentucky state bars as well as to: U.S. Court of Appeals for the 10th Circuit, U.S.

District Court for the District of Colorado, U.S. Court of Appeals for the D.C. Circuit,

U.S. District Court for the District of Arizona, U.S. District Court for the District of

Maryland,[6] Supreme Court of the United States, U.S. District Court for the District of

Columbia, U.S. Court of Appeals for the 11th Circuit, U.S. District Court for the

Southern District of Georgia, U.S. District Court for the Middle District of Georgia, U.S.

District Court for the Northern District of Georgia, U.S. Court of Appeals for the 2d

Circuit, U.S. District Court for the Eastern District of Kentucky, and the U.S. Court of

Appeals for the 9th Circuit. Although admitted to the Eastern District of Kentucky,

Ukeiley has never filed or participated in a case in that court. Ukeiley has also been

---

[6] Although not relevant, in the interest of complete disclosure, we note that the status of
Ukeiley's bar membership in District of Maryland is currently under dispute as a person
in the clerk's office claims that his inactive status in the Maryland state bar makes him
ineligible for membership in the District of Maryland bar. He disagrees and is attempting
to resolve this.

admitted *pro hac vice* to: U.S. District Court for the Southern District of Ohio, and U.S.
District Court for the Middle District of Pennsylvania.  Ukeiley Decl. ¶ 28.

Ukeiley's work in the D.C. District Court stretches back to his law school days.
While attending George Washington University (GW) Law School, Ukeiley worked for
Professor Jennifer Lyman at the GW Law School Clinic from 1993 to 1995.  One of
Ukeiley's principal responsibilities as Prof. Lyman's research assistant was to help
litigate two civil rights cases in the D.C. District Court which Prof. Lyman had inherited
from the previous clinical professor.  Ukeiley Decl. ¶ 29.

Ukeiley also interned at the Federal Public Defender's Office in D.C. during law
school, thus increasing his early experience with the D.C. District Court.[7]  Over the
course of his career, Ukeiley has practiced more cases in the D.C. District Court than in
any other court.  Ukeiley Decl. ¶¶ 30-31.

Ukeiley's law practice-related connection to Kentucky is very limited.  For
example, Ukeiley has never had a client physically in his office in Kentucky.  Ukeiley
does a considerable amount of his work outside his office and outside Kentucky.  He
spends much of the summer in Colorado and California working.  Ukeiley has no cases in
which he represents only Kentucky clients.  Ukeiley has never filed a case in federal
court in Kentucky.  For the one and only case he filed in state court in Kentucky, he had a
co-counsel from Kentucky who serves as local counsel as well as co-counsel from
California.  Ukeiley Decl. ¶¶ 32-33.

---

[7] During law school, Ukeiley also interned for a semester with the U.S. Department of
Justice's Environmental Crimes Section.  While this office was in D.C., none of
Ukeiley's work involved cases in D.C. courts.

Aside from the labor unions, the rest of Ukeiley's firm's work is all on a *pro bono* basis. This *pro bono* work can be divided into three categories in terms of billing. The first category is *pro bono* work in which the firm receives no income at all and has no possibility of receiving any income. This includes work representing clients as well as work consulting with other public interest lawyers on Clean Air Act work when they seek Ukeiley's opinions. For example, during the week of June 11 – 15, 2007, Ukeiley received an e-mail from a public interest lawyer working for a non-profit in D.C. (who is a former high ranking EPA official) seeking his opinion on a Clean Air Act question, an e-mail from a public interest lawyer working for a non-profit environmental law firm in Alaska seeking his opinion on a Clean Air Act question, an e-mail from a public interest lawyer working for a non-profit environmental law firm in Colorado seeking his opinion on a Clean Air Act question, and an e-mail from Ukeiley's former associate, who is now a public interest lawyer working for a large non-profit environmental law firm in D.C., seeking his opinion on a Clean Air Act question. This level of *pro bono* consultation with the public interest environmental bar on Clean Air Act issues is typical for Ukeiley. Ukeiley Decl. ¶¶ 34-35.

The second type of *pro bono* arrangement is where Ukeiley's firm does not charge the client anything for their time but hopes to recover under a statutory fee shifting provision. This case is an example of this type of *pro bono* arrangement. Full recovery at market rates in these cases is critical for the financial viability of Ukeiley's public interest firm. Ukeiley Decl. ¶ 36.

The third type of *pro bono* is what public interest lawyers sometimes refer to as "low bono" or a reduced rate case. Ukeiley's firm offers these reduced rates because,

simply put, the work would not otherwise get done.  Ukeiley almost always strongly encourages and often facilitates clients seeking free representation from a non-profit public interest law firm and only takes cases on a "low bono" basis when there is no representation available for free.  Ukeiley Decl. ¶ 37.

Ukeiley currently charges approximately $90 per hour for these low bono cases. This is not a market rate but rather a rate chosen to allow the public interest environmental work to get done.  Ukeiley's firm charges the same $90 for himself and for his first year associates in these cases.  In addition, Ukeiley's firm almost always agrees to a cap on the total amount that he will charge for lawyer time in these low bono cases. These caps results in the effective rate often ending up in the $45 range because the firm puts in almost as much unbillable time into the case as billable time.   Ukeiley Decl. ¶ 38.

As to experience, reputation, and skill as it relates to this case, Ukeiley has spent his entire career working for non-profit public interest environmental law firms or for-profit public interest law firms.  His practice has been almost all public interest environmental litigation although early on in his career, Ukeiley accepted some court-appointed civil rights cases and served as a court appointed alternative criminal defense counsel.  In addition, Ukeiley's initial position after law school was in the nature of a public interest, international environmental lobbyist, working on such treaties as the Inter-America Tropical Tuna Convention that governs the take  of dolphins when fishing. Ukeiley Decl. ¶ 39.

Currently, Ukeiley is one of the most experienced Title V litigators on the public interest side in the country.[8]  In a Title V case Ukeiley litigated, the 11th Circuit noted that: "Navigating through the intricacies of the Clean Air Act is no task for the uninformed or the short-winded."  Sierra Club v. Johnson, 436 F.3d 1269, 1272 (11th Cir. 2006).  Ukeiley Decl. ¶ 40.

Specifically, Ukeiley has drafted comments, or supervised others writing comments on dozens of Title V permits.  Ukeiley has drafted or supervised others writing approximately 16 Title V petitions for objections.  Ukeiley has litigated or is currently litigating approximately ten Title V petition deadline suits similar to this case.  This included one Title V petition deadline case in which Ukeiley unsuccessfully tried to end EPA's pattern and practice of failing to comply with the mandatory 60-day deadline to respond to Title V petitions.  See New York Public Interest Research Group v. Whitman, 214 F.Supp. 2d 1 (D.D.C. 2002).  Had EPA's vigorous defense not succeeded in that case, the present case would have never existed and thus Citizens would not be seeking fees.  Ukeiley Decl. ¶ 41.

Ukeiley litigated, from drafting the comments on the State-issued Title V permit all the way through outlining the reply brief in the appellate courts two substantive challenges to EPA's response to Title V petitions, Sierra Club v. Leavitt, 368 F.3d 1300 (11th Cir. 2004) and Sierra Club v. Johnson, 436 F.3d 1269 (11th Cir. 2006).[9]  Ukeiley is

---

[8] This may seek like quite a boast, considering that Ukeiley only graduated law school in 1995.  However, Title V was only passed in 1990 and was not really implemented much before 1995 as the EPA delayed in promulgating the Title V regulations.  In addition, it is not a very frequently litigated provision, in the relative sense.

[9] Ukeiley's name does not appear on the published decisions because he did not participate in the oral argument, as he left his employment with the Georgia Center for Law in the Public Interest prior to those oral arguments.

currently litigating Sierra Club v. Johnson, 06-10714 in the 11th Circuit which is another challenge to EPA's response to a Title V petition.  Ukeiley has also spent close to 100 days in trials of state-issued Title V permits in front of Administrative Law Judges. Ukeiley has litigated one case against the State of Georgia for systemic delays in issuing Title V permits and one case against EPA for systemic problems with the Georgia Title V program.  As to enforcement, Ukeiley litigated for almost five years a federal Clean Air Act citizen suit that involved, in part, enforcing a Title V permit and resulted in several published opinions.  See e.g. Sierra Club v. Georgia Power Company, 365 F.Supp.2d 1287 (N.D. Ga. 2004); Sierra Club v. Georgia Power Company, 365 F.Supp.2d 1297 (N.D. Ga. 2004) rev'd 443 F.3d 1346 (11th Cir. 2006).  Ukeiley has also been litigating since 2004 an on-going Clean Air Act citizen suit involving, in part, enforcement of a Title V permit.  See Sierra Club v. Dayton Power & Light, 04-905 (S.D. Ohio).  Ukeiley Decl. ¶¶ 42-43.

EPA must recognize Ukeiley's Clean Air Act experience, skill, and reputation, for they have had him teach at least one of EPA's Clean Air Act Prevention of Significant Deterioration (PSD) and Non-Attainment New Source Review (NA NSR) citizen trainings.  PSD and NA NSR are other parts of the Clean Air Act which are applicable requirements which must be included in Title V permits.  See 40 CFR § 70.2 *Applicable requirements* (2).  EPA and EPA's contractor also asked Ukeiley to edit EPA's citizen's guide to PSD and NA NSR.  Finally, EPA's Title V Performance Task Force chose Ukeiley as one of the people to interview to gain a better understanding of how the Title V program was actually working.  Ukeiley's other teaching experience includes teaching Continuing Legal Education (CLE) courses on the Clean Air Act and power plants at the

Public Interest Environmental Law Conference in Eugene, Oregon for at least the past three years.  Ukeiley has also been a presenter on Clean Air Act issues at several Sierra Club events in the last few years.  Ukeiley Decl. ¶¶ 44-45.

Over the years, Ukeiley has done more work for the Sierra Club than for any other client.  Last year, the Sierra Club named Ukeiley as one of their "Legal Heroes."  See http://www.sierraclub.org/environmentallaw/heroes/robert_ukeiley.asp (last visited 6/16/07).  Ukeiley Decl. ¶ 46.

Finally, turning to the prevailing market rates, Ukeiley is asking for the U.S. Attorney's Office's own adjusted Laffey Matrix rate for D.C.  As explained above, courts have long accepted use of an adjusted Laffey Matrix rate as an efficient way to determine a reasonable rate.

It is important to note that use of the U.S. Attorney's Office adjusted Laffey Matrix rate represents a major compromise by Citizens as Citizens are actually entitled to a much higher rate.  This is because the manner in which the U.S. Attorney's Office adjusts the Laffey Matrix substantially underestimates the appropriate rate.  Citizens are only asking $375 for Ukeiley's time based on the U.S. Attorney's Office adjusted Laffey Matrix.  However, a properly adjusted Laffey Matrix would provide for $509 per hour or over 35% more than what Citizens are requesting.  See http://www.laffeymatrix.com/see.html (last visited 6/16/07) citing to McDowell v. District of Columbia, Civ. A. No. 00-594 (RCL), LEXSEE 2001 U.S. Dist. LEXIS 8114 (D.D.C. June 4, 2001); Salazar v. Dist. of Col., 123 F.Supp.2d 8 (D.D.C. 2000).  See also Interfaith Community Organization v. Honeywell International, 336 F.Supp.2d 370, 386-388 (D.N.J. 2004) citing Salazar v. Dist. Of Col., 123 F.Supp.2d at 13-15 aff'd 426 F.3d

694 (3d Cir. 2005).  In <u>Interfaith Community Organization</u>, the 3rd circuit affirmed the rate of $456 as a reasonable rate in D.C. in 2003 for a lawyer with Ukeiley's range of experience.  <u>Interfaith Community Organization</u>, 426 F.3d at 708, ftnt. 11.  In comparison, Citizens are asking $375 for Ukeiley for work done in 2007.[10]

Plaintiff is also asking for U.S. Attorney's Office adjusted Laffey Matrix Rates for a first year associate in the Law Office of Robert Ukeiley, Aubrey Baldwin, as well as law clerk, Elizabeth Middleton.  The analysis above with regard to Ukeiley generally applies to Baldwin and Middleton and they are entitled to an hourly rate of $205 and $120 respectively.[11]  <u>See</u> Ukeiley Decl., Ex. D.

Baldwin is a 2005 graduate of Lewis and Clark Law School.  She received a certificate in environmental and natural resources law.  She also received the environmental alumni association's Williamson Award which is awarded to one graduate per year who has demonstrated an outstanding commitment to public interest environmental work.  During law school, she had a summer position at a non-profit public interest environmental law firm and during the school year, she worked at the law school's environmental clinic.  Baldwin is actually bill out at the U.S. Attorney's Office adjusted Laffey Matrix for Clean Air Act work for various labor unions or individual labor union members, although as of May 2007, she was still billing at last year's rate ($195 per hour).  The rest of her work is done on a *pro bono* basis as described above with regard to Ukeiley.  Ukeiley Decl. ¶¶ 47-49.

---

[10] Although irrelevant, it is interesting to note that the $375 rate for Ukeiley is within the range of rates charged by partners at law firms in and around Kentucky according to a National Law Journal article provided to Plaintiff's counsel by a DOJ counsel working on another Title V petition deadline suit.  <u>See</u> Ukeiley Decl. at ¶ 56 & Exhibit A.

[11] Again, Ukeiley will exercise his billing discretion and only request rates based on the June 1, 2006 to May 31, 2007 U.S. Attorney's Office Laffey Matrix rates.

Middleton is actually bill out at the U.S. Attorney's Office adjusted Laffey Matrix for Clean Air Act work for various labor unions or individual labor union members. Moreover, the prevailing market rate according to the U.S. Attorney's Office, is $120 for paralegals and law clerks.  Ukeiley Decl. ¶¶ 47, 50-51.

Although this case resolved rapidly, so counsel were not required to travel to D.C., this case does not even approximate the "extreme situation" faced in Davis. Citizens' counsel are private attorneys with their practice dedicated to representing non-profit organizations and individuals in cases of public importance.

With respect to Ukeiley, the Laffey Matrix rates of $360 and $375 reflects the rate he actually charges to his non-*pro bono* clients adjusted for the current year.  Because the rates regularly charged by Ukeiley are equivalent to the Laffey Matrix rates, the Davis exception is inapplicable.

Nor is the Davis analysis even applicable in this case.  Since all counsel represented Citizens on a *pro bono* basis, with only the filing fee and other case costs covered by Citizens, and payment of attorneys' fees contingent upon success.   This is the precise type of public interest-minded litigation Congress contemplated in developing the Clean Air Act citizen suit provision (and similar fee-shifting provisions in federal law).  See S. Rep. No. 94-1011, at 6, 1976 U.S.C.C.A.N. 5908, 5913 (Senate Report accompanying 42 U.S.C. § 1988), cited with approval in Blum v. Stenson, 465 U.S. 886 (1984);  Pennsylvania v. Del. Valley Citizens Council for Clean Air, 478 U.S. 546, 559 (1986) (purposes behind Clean Air Act § 304(d) and § 1988 are "nearly identical"); see also Covington, 57 F.3d at 1107-08.  As noted above, the exception in Davis was to "prevent the occasional erratic result where the successful petitioner is vastly

overcompensated given the amount he contracted to pay for legal services." Davis, 169

F.3d at 758. There is zero risk of such overcompensation here, since Citizens did not

compensate his counsel at all. Ukeiley Decl. ¶ 52.

In sum, because counsel represented Citizens without Citizens having to pay

counsel for counsel's time, because Ukeiley, Baldwin and Middleton's actual rates

charged to non-*pro bono* clients is the same or almost the same as the U.S. Attorney's

Laffey Matrix rate, because Ukeiley has considerable experience and skill and enjoys a

strong national reputation, even with EPA, with regard to Clean Air Act and Title V

litigation, and because the U.S. Attorney's Laffey Matrix rate represents or actually

under-represents the prevailing market rate in the forum of this case, the Court should

find the following rates reasonable: Ukeiley: prior to June 1, 2006: $360; after June 1,

2006: $375; Baldwin: $205; and Middleton: $120.[12]

### C.    Reasonable Hours Expended

The billable hours Citizens are requesting on this matter are also reasonable.

Under federal fee-shifting statutes, Citizens' attorneys are entitled to be compensated for

every item of service which, at the time rendered, would have been undertaken by a

reasonable and prudent lawyer to advance or protect his client's interest. See Blanchard

v. Bergeron, 489 U.S. 87, 94 (1989); Nat'l Ass'n of Concerned Veterans v. Sec'y of

Defense, 675 F.2d 1319, 1323-27 (D.C. Cir. 1982); see also Role Models America, Inc.

v. Brownlee, 353 F.3d 962, 968 - 970 (D.C. Cir. 2004); Save Our Cumberland Mountains

v. Hodel, 857 F.2d 1516, 1522-24 (D.C. Cir. 1988). As succinctly put forward by the

---

[12] This Court has previously granted rates for Ukeiley based on the U.S. Attorney's
Office's adjusted Laffey Matrix in Center for Biological Diversity v. Norton, 04-0156
(JDB)(DDC Jan. 26, 2005) at 5. Attached as Exhibit B to Ukeiley Decl.

Sixth Circuit: "The question is not whether a party prevailed on a particular motion or whether in hindsight the time expenditure was strictly necessary to obtain the relief achieved. Rather, the standard is whether a reasonable attorney would have believed the work to be reasonably expended in pursuit of success at the point in time when the work was performed." Wooldridge v. Marlene Industries Corp., 898 F.2d 1169, 1177 (6th Cir. 1990). The relevant issues are whether Citizens' counsel exercised sound legal judgment under the circumstances and whether the success that was achieved warrants the full lodestar. See City of Riverside v. Rivera, 477 U.S. 561, 572 (1986); Moore v. Jas. H. Matthews, 682 F.2d 830, 839 (9th Cir. 1982).

The hours claimed by Citizens' attorneys and law clerk here are described fully in their declarations and supporting contemporaneous time records. See Ukeiley Decl., ¶¶ 12 – 13 & Ex. C. As such, counsel's hours are presumptively reasonable: "Sworn testimony that, in fact, it took the time claimed is evidence of considerable weight on the issue of the time required in the usual case." Perkins v. Mobile Housing Bd., 847 F.2d 735, 738 (11th Cir. 1988). To deny compensation, therefore, "it must appear that the time claimed is obviously and convincingly excessive under the circumstances." Id.

To avoid wasting the Court's time with petty squabbles over minor entries, Plaintiffs' counsel have exercised their billing discretion and reduced their hours by 15% across the board . See e.g. Center for Biological Diversity v. Norton, 04-0156 (JDB)(DDC Jan. 26, 2005) at 3-4(reducing hours by 15%) attached to Ukeiley Decl. as Exhibit B. Using this method, the appropriate lodestar for Citizens' counsel is as follows:

| Attorney/Staff | Yrs. Exp. | Rate | Hours | Total Fees |
|---|---|---|---|---|
| Robert Ukeiley | 12 | $360 | 1.4 | $ 504 |

|  |  | $375 | 10 | $3,750 |
| Aubrey Baldwin | 2 | $205 | 19.1 | $3,915.50 |
| Elizabeth Middleton | -- | $120 | 5.6 | $ 672 |
| Total fees |  |  |  | $8,841.50 |
| Stipulated Costs: |  |  |  | $ 388.28 |
| Total fees and costs: |  |  |  | $9,229.78 |

**V.     CONCLUSION**

For the foregoing reasons, Citizens respectfully requests that the Court grant its Motion for Fees and Costs in the amount of $8,841.50 in attorneys' fees and costs in the stipulated amount of $388.60.  In accordance with INS v. Jean, 496 U.S. 154, 162-63 (1990), Citizens will also seek recovery for the time spent on reply in the fee litigation. Citizens will submit a supplemental declaration with their reply brief detailing the additional sums to which they are entitled.

Respectfully submitted,

/s/ _____
Robert Ukeiley
Law Office of Robert Ukeiley
435R Chestnut Street, Ste. 1
Berea, KY 40403
T: (859) 986-5402
F: (866) 618-1017
E-mail: rukeiley@igc.org

Counsel for Plaintiffs

Dated: July 13, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROCKY MOUNTAIN CLEAN AIR          )
ACTION, <u>et al.</u>,                         )
                                  )
            Plaintiffs,           )
                                  )
      v.                          )    Civil Action No. 06-01992 (JR)
                                  )
STEPHEN L. JOHNSON,               )
Administrator, United States      )
Environmental Protection          )
Agency                            )
                                  )
            Defendant.            )
_____ )

## <u>DECLARATION OF ROBERT UKEILEY IN SUPPORT OF PLAINTIFFS'</u>

## <u>MOTION FOR AWARD OF ATTORNEYS' FEES AND COSTS</u>

I, Robert Ukeiley, do declare and if called as a witness would testify as follows:

1.      I am an attorney licensed to practice before the courts of the States of

Maryland (Inactive status), Colorado (Inactive status), Georgia and Kentucky. I am an

attorney of record in this case. I am and have been an attorney of record for the Plaintiffs

since the filing of this action. I agreed to represent Plaintiffs in this suit against the

Administrator of the U.S. Environmental Protection Agency for violations of the Clean

Air Act in regards to the Clean Air Act Title V petitions filed by Rocky Mountain Clean

Air Action and Jeremy Nichols. I am submitting this declaration in support of Plaintiffs'

motion for reasonable attorneys' fees and costs for work conducted in the District Court.

I have personal knowledge of the facts set forth herein and am competent to testify as to

them if called.

1

2.      I am a member in good standing with the State Bars of Maryland (inactive status), Colorado (inactive status), Georgia, and Kentucky. I am admitted to practice in this Court as well as the United States District Courts for the Districts of Maryland[1] and Colorado and the Northern, Middle and Southern Districts of Georgia and the Eastern District of Kentucky. Although admitted to the Eastern District of Kentucky, I have never filed or participated in a case in that court. I have also been admitted *pro hac vice* to: U.S. District Court for the Southern District of Ohio and U.S. District Court for the Middle District of Pennsylvania.

I am also admitted to the Supreme Court of the United States as well as the United States Courts of Appeals for the District of Columbia, the Second, the Tenth, the Eleventh and the Ninth Circuits. I am not admitted to the Sixth Circuit.

3.      In 1995 I graduated from George Washington University Law School, with honors, in Washington, D.C. During law school, I was a member of the Environmental Lawyer, a law journal that focuses exclusively on environmental law issues. During law school I interned for the United States Department of Justice's Environmental Crimes Section and participated in a clinic in which I worked part-time at the Office of the Federal Public Defender's in Washington, D.C. I also worked for two years as the research assistant to Professor Jennifer Lyman.

4.      Upon graduation I began working on international environmental law issues on behalf of conservation and animal welfare organizations as a law clerk at the Law Offices of Leesteffy Jenkins in Washington, D.C. Upon being admitted to the bar in

---

[1] The status of my bar membership in District of Maryland is currently under dispute as a person in the clerk's office claims that my inactive status in the Maryland state bar makes me ineligible for membership in the District of Maryland bar. I disagree and am attempting to resolve this.

Maryland, I worked for one year for a non-profit public interest environmental law firm called Greenlaw. I then spent approximately three and a half years in solo practice or with one partner in a private, public interest environmental law firm. During this time, I also did a limited amount of court-appointed criminal defense work and court-appointed civil rights work. I then spent approximately three years working for another non-profit public interest environmental law firm called the Georgia Center for Law in the Public Interest. At the Georgia Center for Law in the Public Interest, I was the Director and Staff Attorney for the Georgia Clean Air Project.

5.     Since, October of 2003, I have been in my own private, public interest environmental law firm. Although I am located in Berea, Kentucky, I do not represent any Berea-based clients and do not have any cases in courts in Berea or Madison County, Kentucky. In fact, I only have one case in a Kentucky court. I live and work in Berea, Kentucky for personal reasons.

6.     My practice is 100% public interest environmental law with a focus on Endangered Species Act and Clean Air Act litigation. I mainly represent clients at no charge in the hopes of recovering fees under the environmental statutes' fee shifting provisions. However, I do represent some clients while charging them a public interest rate which is substantially below my market rate. I will describe my billing practices in more detail below.

7.     My work in this Court began while I was in law school at George Washington University. In 1993, when I began working for Prof. Lyman, the Clinic that Prof. Lyman ran had two civil rights cases in this Court in front of Judge Jackson. These cases were left over from the previous Clinical Director and Prof. Lyman chose not to

assign the cases to clinic students. Therefore, one of my primary tasks was assisting Prof.
Lyman in litigating these cases. In addition, as mentioned above, I also worked part time
in the Federal Public Defender's office in Washington, D.C as part of a law school clinic.
While in private practice in Colorado, I represented numerous clients in several cases in
this Court. Representative cases included <u>San Juan Audubon Society v. Wildlife
Services</u>, 00-cv-785(RMU)(Endangered Species Act case); <u>Fund for Animals v. Reno</u>,
99-cv-3316(EGS)(case challenging federal government's killing of black tailed prairie
dogs); <u>Animal Protection Institute v. Wildlife Services</u>, 99-cv-3149(PLF).

8.    While working for the Georgia Center for Law in the Public Interest, I
represented several clients in several cases in this Court. Representative cases included
<u>Sierra Club v. Whitman</u>, 01-cv-1991(ESH); <u>NYPIRG v. Whitman</u>, 02-cv-337(ESH)
consolidated with <u>Sierra Club v. Whitman</u>, 02-cv-338(ESH).

9.    Overall, I have successfully represented conservation and environmental
non-profit organizations in approximately 20 "deadline" suits against the federal
government.

10.    In this case I represent the Plaintiffs in the role of lead counsel. The
Plaintiffs are not paying me for my time working on this case. Rather, I took this case
based on an expectation of the likelihood of recovering fees under the Clean Air Act's fee
shifting provision in a reasonably timely manner.

11.    I am requesting an hourly rate of $360 for work from May 31, 2005 to
June 1, 2006 and $375 for work after June 1, 2006 per billable hour based on the United
States Attorney's Office Laffey Matrix which is available at
<u>http://www.usdoj.gov/usao/dc/Divisions/Civil_Division/Laffey_Matrix_6.html</u>. I

4

graduated law school in the summer of 1995. This would put me in the 11-19 year row. Although some of my billable time was spent after June 1, 2007, I am willing to exercise my billing discretion and request that all of my time after June 1, 2006 be compensated in the 2006-2007 column. Thus, the fair market rate for my billable time is $360 per hour prior to June 1, 2006 and $375 per hour after June 1, 2006.

12.     I maintained contemporaneous records of the time spent and expenses incurred on this case, and have set forth my billing record for myself as well as my associate, Aubrey Baldwin, and my law clerk Liz Middleton, which details the time spent on this case, in Exhibit C.  In Exhibit C, entries that start with "RU" are for me, entries that start with "AB" are for Aubrey Baldwin, entries that start with "LM" are for Liz Middleton.  Throughout the course of this litigation, my staff and I kept careful time records, knowing from the initiation of the action that any compensation would be based on attorneys' fees recovered as part of the judgment or settlement.  However, my billing records actually underestimate the amount of time I have spent on this case because sometime I do not record short tasks like certain telephone calls and e-mails.  I have carefully inspected the time records in this case and have exercised billing judgment to only claim time that was legitimate, non-duplicative and necessary for this case.  My records establish that I am entitled to a total of 1.7 billable hours prior to June 1, 2006, and 11.8 billable hours after June 1, 2006, Aubrey Baldwin is entitled to 22.5 billable hours, and Liz Middleton is entitled to 6.6 billable hours.  See Exhibit C.

13.     However, in order to avoid wasting judicial resources arguing over trivial amounts, I am exercising my billing discretion and reducing our billable hours requested

by approximately 15% to 1.4 hours for myself prior to June 1, 2006, 10 hours for myself
after June 1, 2006, 19.1 hours for Aubrey Baldwin, and 5.6 hours for Liz Middleton.

14.    At a rate of $360 per hour, after reducing my hours pursuant to my billing
discretion, the lodestar for my work on this case prior to June 1, 2006 comes to $504.  At
a rate of $375 per hour, after reducing my hours pursuant to my billing discretion, the
lodestar for my work on this case after June 1, 2006 comes to $ 3,750.

15.    At $205 per hour, Ms. Baldwin's loadstar comes to $3,915.50.

16.    At $120 per hour, Ms. Middleton's loadstar comes to $ 672.

17.    All together, I am requesting $8,841.50 in reasonable attorneys' fees, for
my law firm's work on this case.  This is a reasonable amount considering the work we
have done on this case and our experience.

18.    The United States Environmental Protection Agency (EPA) has a clear
pattern and practice of not complying with the mandatory 60-day deadline in 42 U.S.C. §
7661d(b)(2) to respond to petitions for objections to Title V permits.  As far as I am
aware, EPA has claimed that they have responded to only one Title V petition without
action by the petitioner.  As far as I am aware, EPA has only responded to one Title V
petition after a 60-day notice of intent to sue for violation of the mandatory duty in 42
U.S.C. § 7661d(b)(2) was sent.  For every other Title V petition, EPA has either not
responded or EPA only responded after the petitioner filed a complaint alleging a
violation of EPA's mandatory duty in 42 U.S.C. § 7661d(b)(2).

19.    EPA typically responds or reaches an agreement to respond to the petition
shortly before EPA's answer to the complaint in the mandatory duty citizens suit is due.
Thus, EPA is in effect using litigation in which it knows that it has no defense as a means

of gaining at least a 120 day extension to comply with its mandatory duty in 42 U.S.C. §

7661d(b)(2).

20.    A reasonable rate for my time in this case is $360 per hour prior to June 1,

2006 and $375 per hour after June 1, 2006 which is the rate provided for a lawyer with

my level of experience in the U.S. Attorney's Office for the District of Columbia's

adjusted Laffey Matrix.  I am using my billing discretion to request no more than $375

per hour, even for work done after June 1, 2007 for which the U.S. Attorney's Office's

revised Laffey Matrix would provide a higher rate.

21.    Turning first to my firm's billing practices, my firm has a 100%

environmental public interest for-profit practice.  We only represent groups or individuals

in enforcing federal environmental laws or state laws or regulations implementing federal

environmental laws.  Our practice only seeks injunctive or declaratory relief or civil

penalties that go to the federal treasury rather than the plaintiffs.[2]

22.    Our practice focuses predominately on the Clean Air Act with a lesser

focus on the Endangered Species Act.  Our practice predominately involves representing

non-profit organizations, with the occasional individual named as a co-plaintiff although

on rare occasions, the practice does involve representing public interest minded

individuals.

23.    Our practice involves charging "variable rates (both at and below the

market, with the latter attributable to public-spirited goals" of maximizing environmental

and public health protection.  See Covington, 57 F.3d at 1108.  We represent labor unions

and individual members of labor unions regarding Clean Air Act permits issued by the

---

[2] This is not to imply that monetary damages cannot serve the public interest.

7

Indiana Department of Environmental Management.   In these matters, we charge a rate based on the Laffey Matrix.  We are currently charging $375 per hour for my time.

24.     I charge my market rates to these clients because I believe charging this rate will not affect the degree of environmental protection, considering the relative resources available to the labor unions.

25.     Between incorporating my present law firm in December of 2003 and June 21, 2007, we have worked on 14 of these matters in Indiana.  We billed and collected over $66,000 at the Laffey Matrix rates for this work.  These are not fee shifting matters so the client is paying our market rate with no ability to recoup these fees.  This represents a substantial portion of the firm's total income during this period because of the firm's public interest nature.

26.     The rate is based on the Laffey Matrix because in reality, my firm has a nationwide practice but the majority of its work is in D.C. federal courts.  For example, as of June 21, 2007, the firm had 16 cases in active litigation.  Of these 16 cases, nine are in this Court (the U.S. District Court for the District of Columbia), one is in the U.S. Court of Appeals for the District of Columbia Circuit, one is in the U.S. District Court for the Northern District of Georgia, one is in the U.S. District Court for the Southern District of Ohio, one is in front of an Administrative Law Judge on the Kentucky Environment and Public Protection Cabinet, one is in the Pennsylvania Supreme Court, one is in the United States Court of Appeals for the Eleventh Circuit, and one is in the Franklin County, Kentucky Circuit Court.  However, in the Franklin County Circuit Court, there is a Kentucky lawyer who serves the role of local counsel in this case.  We are involved in this last case, as well as the case in front of the Kentucky Administrative Law Judge

8

because the cases involve Clean Air Act challenges to coal fired power plants, which is

my specialty.  I represent the Sierra Club in these two cases.  The Sierra Club is a nation-

wide environmental organization based in San Francisco, California.

27.    I live in Kentucky simply for personal reasons.  Thus, my practice is issue-

based rather than place-based.

28.    My bar membership also reflects the nation wide scope of my practice.  I

am admitted to the Maryland, Colorado, Georgia and Kentucky state bars as well as to:

U.S. Court of Appeals for the 10th Circuit, U.S. District Court for the District of

Colorado, U.S. Court of Appeals for the D.C. Circuit, U.S. District Court for the District

of Arizona, U.S. District Court for the District of Maryland,[3] Supreme Court of the

United States, U.S. District Court for the District of Columbia, U.S. Court of Appeals for

the 11th Circuit, U.S. District Courts for the Southern, Middle and Northern Districts of

Georgia, U.S. Court of Appeals for the 2d Circuit, U.S. District Court for the Eastern

District of Kentucky, and the U.S. Court of Appeals for the 9th Circuit.  Although

admitted to the Eastern District of Kentucky, I have never filed or participated in a case

in that court.  I have also been admitted *pro hac vice* to: U.S. District Court for the

Southern District of Ohio and U.S. District Court for the Middle District of Pennsylvania.

29.    My work in the D.C. District Court stretches back to my law school days.

While attending George Washington University (GW) Law School in D.C., I worked for

Professor Jennifer Lyman at the GW Law School Clinic from 1993 to 1995.  One of my

principle responsibilities as Prof. Lyman's research assistant was to help litigate two civil

---

[3] The status of my bar membership in District of Maryland is currently under dispute as a
person in the clerk's office claims that my inactive status in the Maryland state bar makes
me ineligible for membership in the District of Maryland bar.  I disagree and am
attempting to resolve this.

rights cases in the D.C. District Court which Prof. Lyman had inherited from the previous clinical professor.

30.    I also interned at the Federal Public Defender's Office in D.C. during law school, thus increasing my early experience with the D.C. District Court.[4]

31.    Over the course of my career, I have practiced far more cases in the D.C. District Court than in any other court.

32.    My law practice-related connection to Kentucky is very limited. For example, I have never had a client physically in my office in Kentucky. I do a considerable amount of my work outside of my office and outside Kentucky. I spend much of the summer months in Colorado and California.

33.    I have no cases in which I only represent Kentucky clients. I have never filed a case in federal court in Kentucky. For the one and only case I filed in state court in Kentucky, I had a co-counsel from Kentucky who serves as local counsel as well as co-counsel from California. I spend two to four weeks per year in Berkeley, California each year. I work during this entire time. As my personal situation allows, I will spend less and less time in Berea and more and more time doing my work while physically located in other locations such as Berkeley or Colorado.

34.    Besides for the labor unions, the rest of my firm's work is all on a *pro bono* basis. This *pro bono* work can be divided into three categories in terms of billing practices. The first category is *pro bono* work in which the firm receives no income at all and has no possibility of receiving any income. This includes work representing clients

---

[4] During law school, I also interned for a semester with the U.S. Department of Justice's Environmental Crimes Section. While this office was in D.C., none of my work involved cases in D.C. courts.

as well as work consulting with other public interest lawyers on Clean Air Act work when the other public interest lawyers are seeking my opinions.

35.    For example, during the week of June 11 – 15, 2007, I received an e-mail from a public interest lawyer working for a non-profit in D.C. (who is a former high ranking EPA official) seeking my opinion on a Clean Air Act question, an e-mail from a public interest lawyer working for a non-profit environmental law firm in Alaska seeking my opinion on a Clean Air Act question, an e-mail from a public interest lawyer working for a non-profit environmental law firm in Colorado seeking my opinion on a Clean Air Act question, and an e-mail from my former associate, who is now a public interest lawyer working for EarthJustice in D.C., seeking my opinion on a Clean Air Act question. This is a typical level for me of *pro bono* consultation with the public interest environmental bar on Clean Air Act issues.

36.    The second type of *pro bono* arrangement is where my firm does not charge the client anything for their time but hopes to recovery under a statutory fee shifting provision. This case is an example of this type of *pro bono* arraignment. Full recovery at market rates in these cases is critical for the financial viability of my public interest firm.

37.    The third type of *pro bono* is what public interest lawyers often refer to as "low bono" or a reduced rate case. My firm offers these reduced rates because, simply put, the work would not otherwise get done. I almost always strongly encourage and often facilitate the clients seeking free representation from a non-profit public interest law firm and only takes the case on a "low bono" basis when there is no representation available for free.

11

38.     We currently charges approximately $90 per hour for these low bono cases. This is not a market rate but rather a rate chosen to allow the public interest environmental work to get done. My firm charges the same $90 for myself and for my first year associates in these cases. In addition, my firm almost always agrees to a cap on the total amount that we will charge for lawyer time in these low bono cases. These caps results in the effective rate often ending up in the $45 range because the firm ends up putting in almost as much unbillable time into the case as billable time.

39.     As to experience, reputation and skill as it relates to this case, I have spent my entire career working for non-profit public interest environmental law firms or for-profit public interest law firms. My practice has been almost all public interest environmental litigation although early in my career, I accepted some court appointed civil rights cases and served as a court-appointed alternative criminal defense counsel. In addition, my initial position after law school was in the nature of a public interest, international environmental lobbyist, working on such treaties as the Inter-America Tropical Tuna Convention that governs the take of dolphins when fishing.

40.     Currently, I am one of the most experienced Title V litigators on the public interest side in the country.[5] In a Title V case I litigated, the 11th Circuit noted that: "Navigating through the intricacies of the Clean Air Act is no task for the uninformed or the short-winded." Sierra Club v. Johnson, 436 F.3d 1269 (11th Cir. 2006).

---

[5] This may seek like quite a boast, considering that I only graduated law school in 1995. However, it is important to recall that Title V was only passed in 1990 and was not really implemented much before 1995 as the EPA delayed in promulgating the Title V regulations. In addition, it is not a very frequently litigated provision, in the relative sense.

41.    Specifically, I have drafted comments, or supervised others writing comments on dozens of Title V permits. I have drafted or supervised others writing approximately 16 Title V petitions for objections. I haves litigated or am currently litigating approximately ten Title V petition deadline suits similar to this case. This included one Title V petition deadline case in which I unsuccessfully tried to end EPA's pattern and practice of failing to comply with the mandatory 60-day deadline to respond to Title V petitions. See New York Public Interest Research Group v. Whitman, 214 F.Supp. 2d 1 (D.D.C. 2002). Had EPA's vigorous defense not succeeded in that case, the present case would have never existed and thus Plaintiff would not be seeking fees.

42.    I handled, from drafting the comments on the State-issued Title V permit all the way through outlining the reply brief in the appellate courts two substantive challenges to EPA's response to Title V petitions, Sierra Club v. Leavitt, 368 F.3d 1300 (11th Cir. 2004) and Sierra Club v. Johnson, 436 F.3d 1269 (11th Cir. 2006).[6] I am currently litigating Sierra Club v. Johnson, 06-10714 in the 11th Circuit which is another challenge to EPA's response to a Title V petition. I have also spent close to 100 days in trials of state issued Title V permits in front of Administrative Law Judges. I litigated one case against the State of Georgia for systemic delays in issuing Title V permits and one case against EPA for systemic problems with the Georgia Title V program as a whole.

43.    As to enforcement, I litigated for almost five years a federal Clean Air Act citizen suit that involved, in part, enforcing a Title V permit and resulted in several

---

[6] My name does not appear on the published decisions because I did not participate in the oral argument, as I left my employment with the Georgia Center for Law in the Public Interest prior to those oral arguments.

published opinions. See e.g. Sierra Club v. Georgia Power Company, 365 F.Supp.2d

1287 (N.D. Ga. 2004); Sierra Club v. Georgia Power Company, 365 F.Supp.2d 1297

(N.D. Ga. 2004) rev'd 443 F.3d 1346 (11th Cir. 2006). I have also been litigating since

2004 an on-going Clean Air Act citizen suit involving, in part, enforcement of a Title V

permit. See Sierra Club v. Dayton Power & Light, 04-905 (S.D. Ohio).

44.    EPA appears to recognize my Clean Air Act experience, skill and

reputation for they have had me teach at least one of EPA's Clean Air Act Prevention of

Significant Deterioration (PSD) and Non-Attainment New Source Review citizen

trainings.[7] PSD and NA NSR are other parts of the Clean Air Act which are applicable

requirements which must be included in Title V permits. See 40 CFR § 70.2 *Applicable*

*requirements* (2).    EPA and EPA's contractor also asked me to edit EPA's citizen's

guide to PSD and NA NSR. Finally, EPA's Title V Performance Task Force chose me as

one of the people to interview to gain a better understanding of how the Title V program

was actually working.

45.    My other teaching experience includes teaching Continuing Legal

Education (CLE) courses on the Clean Air Act and power plants at the Public Interest

Environmental Law Conference in Eugene, Oregon for at least the past three years. I

have also been a presenter on Clean Air Act issues at several Sierra Club events in the

last few years.

46.    Over the years, I have done more work for the Sierra Club than for any

other client. Last year, the Sierra Club named me as one of their "Legal Heroes." See

---

[7] I may have taught at two of these trainings but I cannot recall for certain.

http://www.sierraclub.org/environmentallaw/heroes/robert_ukeiley.asp (last visited 6/16/07).

47.    $205 per hour is a reasonable rate for a first year associate in the Law Office of Robert Ukeiley, Aubrey Baldwin. $120 per hour is a reasonable rate for Liz Middleton, a law student Law Clerk in my Office. The facts above with regard to my firm and I generally applies to Ms. Baldwin and Ms. Middleton.

48.    Ms. Baldwin is a 2005 graduate of Northwestern School of Law of Lewis and Clark College in Portland, Oregon. She received a certificate in environmental and natural resources law. She also received the environmental alumni association's Williamson Award which is awarded to one graduate per year who has demonstrated an outstanding commitment to public interest environmental work. During law school, she had a summer position at a non-profit public interest environmental law firm and during the school year, she worked at the law school's environmental clinic.

49.    Ms. Baldwin is actually paid at the U.S. Attorney's Office adjusted Laffey Matrix for Clean Air Act work for various labor unions or individual labor union members, although as of May 2007, she was still billing at last year's rate ($195 per hour). The rest of her work is done on a *pro bono* basis as described above with regard to myself.

50.    RESERVED

51.    Liz Middleton is a law student at University of Kentucky Law School and a part-time summer law clerk at the Law Office of Robert Ukeiley. Ms. Middleton is actually paid at the U.S. Attorney's Office adjusted Laffey Matrix for Clean Air Act work for various labor unions or individual labor union members which is currently $120 per

15

hour. The prevailing market rate according to the U.S. Attorney's Office, is $120 for law clerks.

52.    My firm represented Citizens in this case on a *pro bono* basis, with only the filing fee and other external costs covered by Citizens and payment of fees contingent upon success.

53.    This Court has previously granted rates for my time based on the U.S. Attorney's Office's adjusted Laffey Matrix in <u>Center for Biological Diversity v. Norton</u>, 04-0156 (JDB)(DDC Jan. 26, 2005) at 5. Attached as Exhibit B.

54.    EPA's record of compliance with the mandatory 60-day deadline in 42 U.S.C. § 7661d(b)(2) is abysmal. In almost every single case, EPA does not respond to a Title V petition until after a citizen suit has been filed to force compliance with this mandatory duty.

55.    EPA does not review most proposed Title V permits forwarded to it by state permitting agencies.

56.    Attached as Exhibit A to this declaration is a firm by firm sampling of billing rates from the National Law Journal. Eileen McDonough, an attorney with the U.S. Department of Justice's Environmental Defense Section provided this document to Aubrey Baldwin of my firm via a May 10, 2007 e-mail. The highlighted entries were on the document when we received it. I assume Ms. McDonough or someone else in her Section highlighted these entries.

57.    Attached as Exhibit D is the Laffey Matrix which I downloaded off of the

U.S. Attorney for the District of Columbia's web page.


I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.


7/13/07
Date

Robert Ukeiley

# EXHIBIT A

12/11/2006 Nat'l L.J. S2, (Col. 1)

The National Law Journal
Vol. 29, No. 15
Copyright 2006 by American Lawyer Media, ALM, LLC

December 11, 2006

In Focus: Billing

FIRM-BY-FIRM SAMPLING OF **BILLING RATES** NATIONWIDE

The National Law Journal asked the respondents to its 2006 **survey** of the nation's 250 largest law firms to provide a range of hourly **billing rates** for partners and associates. The firms that supplied this information--including some firms that are not in the NLJ 250--are listed below in alphabetical order. We also asked firms to provide average and median **billing rates**; several firms provided this information as well. The number after a firm's name indicates the total number of attorneys at the firm. The city listed below the name of a firm is the location of its principal or largest office.

ABC
Adams and Reese (301)
(New Orleans)
Partners $215-$470 (average $287) (median $270)
Associates $165-$250 (average $191) (median $190)
Firmwide (average $267) (median $235)
Andrews Kurth (404)
(Houston)
Partners $380-$745
Associates $180-$400
Arent Fox (288)
(Washington)
Partners $375-$610
Associates $215-$405
Armstrong Teasdale (266)
(St. Louis)
Partners $255-$425 (average $347) (median $342)
Associates $135-$275 (average $227) (median $225)
Firmwide (average $278) (median $270)
Baker, Donelson, Bearman, Caldwell & Berkowitz (454)
(Memphis, Tenn.)
Partners $220-$500
Associates $135-$310
Ballard Spahr Andrews & Ingersoll (486)
(Philadelphia)
Partners $320-$680
Associates $190-$390
Barnes & Thornburg (421)
(Indianapolis)
Partners $245-$455 (average $333)
Associates $170-$285 (average $212)
Firmwide (average $260)
Bass, Berry & Sims (214)
(Nashville, Tenn.)
Partners $230-$495
Associates $150-$245
Bell, Boyd & Lloyd (256)
(Chicago)
Partners $310-$690
Associates $215-$300

Best Best & Krieger (196)
(Riverside, Calif.)
Partners $275-$450 (median $375)
Associates $145-$335 (average $186) (median $225)
Firmwide (average $211) (median $240)
Blackwell Sanders Peper Martin (310)
(Kansas City, Mo.)
Partners $265-$395 (average $302) (median $320)
Associates $155-$255 (average $200) (median $195)
Firmwide (average $241) (median $270)
Blank Rome (460)
(Philadelphia)
Partners $325-$735
Associates $220-$495
Bond, Schoeneck & King (160)
(Syracuse, N.Y.)
Partners $200-$425 (average $252)(median $285)
Associates $140-$305 (average $177) (median $175)
Firmwide (average $231) (median $275)
Briggs and Morgan (165)
(Minneapolis)
Partners $250-475 (average $357) (median $360)
Associates $185-$275 (average $214) (median $205)
Firmwide (average $319) (median $325)
Brinks Hofer Gilson & Lione (151)
(Chicago)
Partners $275-$625 (average $465)(median $460)
Associates $200-$390 (average $280) (median$285)
Firmwide (average $381) (median $390)
Broad and Cassell (173)
(Orlando, Fla.)
Partners $235-$425 (average $339)(median $325)
Associates $155-$295 (average $217) (median $210)
Firmwide (average $272) (median $265)
Brown Raysman Millstein Felder & Steiner (246)
(New York)
Partners $450-$740 (average $495) (median $550)
Associates $250-$400 (average $325) (median $370)
Firmwide (average $385) (median $465)
Brown Rudnick Berlack Israels (208)
(Boston)
Partners $505-$870
Associates $275-$495
Bryan Cave (763)
(St. Louis)
Partners $315-$665 (average $476)
Associates $150-$460 (average $289)
Firmwide (average $331)
Buchalter Nemer (139)
(Los Angeles)
Partners $325-$550 (average $432) (median $445)
Associates $215-$450 (average $256) (median $275)
Firmwide (average $344) (median $350)
Buchanan Ingersoll & Rooney (573)
(Pittsburgh)
Partners $210-$750
Associates $140-$375
Buckingham, Doolittle & Burroughs (171)

(Akron, Ohio)
Partners $230-$425 (average $296) (median $295)
Associates $185-$290 (average $220) (median $215)
Firmwide (average $240) (median $240)
Bullivant Houser Bailey (191)
(Portland, Ore.)
Partners $225-$450 (average $288)(median $285)
Associates $175-$300 (average $204) (median $195)
Firmwide (average $254) (median $230)
Burr & Forman (188)
(Birmingham, Ala.)
Partners $250-$400 (average $324) (median $325)
Associates $160-$315 (average $218) (median $215)
Firmwide (average $234) (median $245)
Butzel Long (217)
(Detroit)
Partners $220-$490 (average $290)
Associates $165-$270 (average $202)
Firmwide (average $243)
Carlton Fields (242)
(Tampa, Fla.)
Partners $285-$545 (average $383) (median $390)
Associates $190-$375 (average $233) (median $233)
Firmwide (average $293) (median $290)
Cooley Godward Kronish (541)
(Palo Alto, Calif.)
Partners $425-$795 (average $539)
Associates $240-$585 (average $371)
Firmwide (average $431)
Covington & Burling (645)
(Washington)
Partners $470-$760
Associates $210-$490
Cozen O'Connor (501)
(Philadelphia)
Partners $185-$750 (average $325) (median $310)
Associates $130-$495 (average $218) (median $210)
Firmwide (average $245) (median $235)
Curtis, Mallet-Prevost, Colt & Mosle (196)
(New York)
Partners $570-$700 (average $625) (median $652)
Associates $250-$510 (average $390) (median $380)
Firmwide (average $508) (median $465)
DEF
Davis Wright Tremaine (405)
(Seattle)
Partners $285-$655 (average $399.34)
(median $395)
Associates $140-$370 (average $251.72) (median $250)
Firmwide (average $350.51) (median $350)
Day, Berry & Howard (251)
(Hartford, Conn.)
Partners $335-$620
Associates $200-$440
Dickinson Wright (226)
(Detroit)
Partners $250-$520
Associates $155-$260

Dickstein Shapiro (360)
(Washington)
Partners $400-$700 (average $530) (median $535)
Associates $210-$415 (average $315) (median $340)
Firmwide (average $300) (median $300)
Dinsmore & Shohl (306)
(Cincinnati)
Partners $220-$440 (average $323) (median $320)
Associates $145-$240 (average $185) (median $180)
Firmwide (average $252) (median $233)
Dorsey & Whitney (600)
(Minneapolis)
Partners $300-$650 (average $431)
Associates $180-$430 (average $273)
Firmwide (average $360)
Duane Morris (581)
(Philadelphia)
Partners $300-$705 (average $436) (median $435)
Associates $200-$425 (average $283) (median $279)
Firmwide (average $379) (median $374)
Dykema Gossett (341)
(Detroit)
Partners $235-$580
Associates $170-$330
Eckert Seamans Cherin & Mellott (227)
(Pittsburgh)
Partners $195-$525 (average $343) (median $340)
Associates $145-$250 (average $190) (median $190)
Firmwide (average $287)
Edwards Angell Palmer & Dodge (516)
(Boston)
Partners $300-$675
Associates $150-$440
Firmwide (average $466)
Epstein Becker & Green (378)
(New York)
Partners $300-$650 (average $468.29)
Associates $160-$395 (average $270.32) (median $260)
Firmwide (average $346.34)
Fenwick & West (234)
(Mountain View, Calif.)
Partners $465-$750 (average $570) (median $575)
Associates $245-$475 (average $355) (median $395)
Firmwide (average $430) (median $450)
Fisher & Phillips (187)
(Atlanta)
Partners $300-$440
Associates $175-$320
Foley & Lardner (981)
(Milwaukee)
Partners (average $517) (median $513)
Associates (average $356) (median $360)
Firmwide $240-$810 (average $446) (median $440)
Ford & Harrison (171)
(Atlanta)
Partners $290-$445
Associates $210-$370
Fowler White Boggs Banker (227)

(Tampa, Fla.)
Partners $280-$500 (average $350) (median $335)
Associates $190-$275 (average $225) (median $220)
Firmwide (average $315) (median $315)
Fox Rothschild (381)
(Philadelphia)
Partners $265-$525
Associates $195-$335
Fredrikson & Byron (209) (Minneapolis)
Partners $250-$525
Associates $175-$275
Frost Brown Todd (376) (Cincinnati)
Partners $205-$435 (average $287) (median $280)
Associates $140-$280 (average $181) (median $180)
Firmwide (average $220) (median $240)
GHI
Gardere Wynne Sewell (282)
(Dallas)
Partners $345-$665 (average $446) (median $450)
Associates $205-$400 (average $273) (median $270)
Firmwide (average $381) (median $345)
Gardner Carton & Douglas (195)
(Chicago)
Partners $275-$650 (average $433) (median $425)
Associates $200-$350 (average $278) (median $250)
Firmwide (average $376) (median $395)
Gordon & Rees (309)
(San Francisco)
Partners $325-$450
Associates $200-$325
GrayRobinson (190)
(Orlando, Fla.)
Partners $200-$500
Associates $140-$200
Greenberg Traurig (1,667) (Miami)
Partners $270-$850 (average $460) (median $475)
Associates $160-$450 (average $289) (median $290)
Firmwide (average $381) (median $395)
Harris Beach (182) (Rochester, N.Y.)
Partners $250-$425
Associates $140-$275
Hiscock & Barclay (160) (Syracuse, N.Y.)
Partners $220-$375 (average $269) (median $250)
Associates $160-$250 (average $183) (median $180)
Firmwide (average $243) (median $250)
Hodgson Russ (229)
(Buffalo, N.Y.)
Partners $220-$625 (average $310) (median $315)
Associates $150-$300 (average $201) (median $195)
Firmwide (average $272) (median $275)
Hogan & Hartson (1,043)
(Washington)
Partners $300-$775 (average $550) (median $550)
Associates $150-$485 (average $350) (median $350)
Firmwide (average $450) (median $475)
Holland & Knight (1,102)
(New York)
Partners $250-$710 (average $396) (median $390)

Associates $165-$400 (average $232) (median $225)
Firmwide (average $344) (median $350)
Holme Roberts & Owen (206)
(Denver)
Partners $260-$575
Associates $185-$390
Howard Rice Nemerovski Canady, Falk & Rabkin (102)
(San Francisco)
Partners $440-$750
Associates $250-$420
Husch & Eppenberger (331)
(St. Louis)
Partners $200-$410 (average $285.35) (median $275)
Associates $130-$250 (average $170.27) (median $165)
Firmwide (average $235.18) (median $230)
Ice Miller (249)
(Indianapolis)
Partners $275-$425 (average $352) (median $345)
Associates $185-$310 (average $218) (median $220)
Firmwide (average $293) (median $220)
JKL
Jackson Lewis (375)
(White Plains, N.Y.)
Partners $290-$525
Associates $190-$395
Jenkens & Gilchrist (268) (Dallas)
Partners $340-$610 (average $420)
Associates $220-$390 (average $270)
Jenner & Block (467) (Chicago)
Partners $410-$800 (average $513) (median $495)
Associates $230-$395 (average $292) (median $285)
Jones, Walker, Waechter, Poitevent, Carrère & Denègre (208) (New Orleans)
Partners $200-$425
Associates $135-$210
Kelley Drye & Warren (375) (New York)
Partners $375-$750
Associates $230-$475
Knobbe Martens, Olson & Bear (193)
(Irvine, Calif.)
Partners $335-$625
Associates $205-$340
Lane Powell (167) (Seattle)
Partners $275-$490 (average $328) (median $330)
Associates $205-$295 (average $236) (median $237)
Firmwide (average $273) (median $270)
Lathrop & Gage (264)
(Kansas City, Mo.)
Partners $220-$375
Associates $140-$220
Lewis, Rice & Fingersh (165)
(St. Louis)
Partners $225-$410
Associates $135-$290
Littler Mendelson (527)
(San Francisco)
Partners $205-$605
Associates $160-$400
Locke Liddell & Sapp (370)

(Houston)
Partners $360-$850 (average $471) (median $460)
Associates $190-$390 (average $244) (median $260)
Firmwide (average $373) (median $410)
Loeb & Loeb (240)
(Los Angeles)
Partners $425-$825
Associates $215-$475
Lord, Bissell & Brook (328)
(Chicago)
Partners $305-$665 (average $448) (median $450)
Associates $200-$375 (average $272) (median $260)
Firmwide (average $368) (median $355)
Lowenstein Sandler (250)
(Roseland, N.J.)
Partners $335-$645
Associates $185-$375
Luce, Forward, Hamilton & Scripps (178)
(San Diego)
Partners $320-$725 (average $440)
Associates $205-$425 (average $265)
MNO
Manatt, Phelps & Phillips (299)
(Los Angeles)
Partners $460-$750 (average $574) (median $560)
Associates $250-$460 (average $359) (median $360)
Firmwide (average $490) (median $520)
Marshall, Dennehey, Warner, Coleman & Goggin (368)
(Philadelphia)
Partners $145-$350
Associates $130-$275
McAndrews, Held & Malloy (89)
(Chicago)
Partners $260-$600
Associates $195-$240
McCarter & English (407)
(Newark, N.J.)
Partners $310-$625
Associates $190-$330
McElroy, Deutsch, Mulvaney & Carpenter (230)
(Morristown, N.J.)
Partners $225-$450 (average $250) (median $235)
Associates $135-$295 (average $180) (median $165)
Firmwide (average $195) (median $200)
McKee Nelson (172)
(Washington)
Partners $595-$875 (average $725) (median $720)
Associates $355-$575 (average $436) (median $430)
McKenna Long & Aldridge (400)
(Atlanta)
Partners $330-$700
Associates $175-$410
Michael Best & Friedrich (255)
(Milwaukee)
Partners $245-$530 (average $341) (median $335)
Associates $175-$325 (average $225) (median $225)
Firmwide (average $305) (median $300)
Miles & Stockbridge (210)

(Baltimore)
Partners $300-$475
Associates $200-$375
Miller, Canfield, Paddock and Stone (355)
(Detroit)
Partners $245-$540 (average $398) (median $405)
Associates $150-$300 (average $215) (median $210)
Firmwide (average $305) (median $310)
Miller & Martin (175)
(Chattanooga, Tenn.)
Partners $210-$430 (average $313) (median $320)
Associates $140-$280 (average $185) (median $180)
Firmwide (average $281) (median $300)
Montgomery, McCracken, Walker & Rhoads (133)
(Philadelphia)
Partners $300-$550 (average $402)
Associates $195-$315 (average $248)
Firmwide (average $338)
Morgan, Lewis & Bockius (1,315)
(Philadelphia)
Partners $375-$800
Associates $200-$550
Morris, Manning & Martin (174)
(Atlanta)
Partners $320-$530 (average $412) (median $403)
Associates $170-$390 (average $246) (median $290)
Firmwide (average $322) (median $350)
Neal, Gerber & Eisenberg (170)
(Chicago)
Partners $350-$695 (average $463) (median $450)
Associates $230-$400 (average $300) (median $300)
Firmwide (average $413) (median $400)
Nelson Mullins Riley & Scarborough (379)
(Columbia, S.C.)
Partners $215-$600
Associates $175-$300
Ogletree, Deakins, Nash, Smoak & Stewart (331)
(Greenville, S.C.)
Partners $250-$550 (average $328)
Associates $165-$330 (average $234)
Firmwide (average $289)
PQR
Patton Boggs (431)
(Washington)
Partners $295-$850 (average $480) (median $570)
Associates $170-$405 (average $305) (median $325)
Firmwide (average $403) (median $510)
Pepper Hamilton (445)
(Philadelphia)
Partners $305-$695
Associates $190-$385
Perkins Coie (576)
(Seattle)
Partners $175-$650
Associates $130-$480
Phelps Dunbar (260)
(New Orleans)
Partners $175-$400 (average $224) (median $323)

Associates $125-$190 (average $165) (median $158)
Firmwide (average $191) (median $263)
Phillips Lytle (173)
(Buffalo, N.Y.)
Partners $225-$410 (average $298) (median $290)
Associates $130-$285 (average $197) (median $185)
Firmwide (average $251) (median $260)
Pitney Hardin (170)
(Florham Park, N.J.)
Partners $365-$625 (average $447) (median $445)
Associates $210-$360 (average $269) (median $270)
Firmwide (average $353) (median $355)
Polsinelli Shalton Welte Suelthaus (276)
(Kansas City, Mo.)
Partners $225-$575
Associates $160-$225
Powell Goldstein (282)
(Atlanta)
Partners $300-$575 (average $435.10) (median $435)
Associates $150-$360 (average $254.44) (median $245)
Firmwide (average $357.88) (median $360)
Preston Gates & Ellis (419)
(Seattle)
Partners $190-$635 (average $399.41) (median $395)
Associates $100-$385 (average $236.39) (median $230)
Firmwide (average $329) (median $325)
Quarles & Brady (442)
(Milwaukee)
Partners $240-$550 (average $360) (median $310)
Associates $185-$310 (average $228) (median $225)
Firmwide (average $306) (median $285)
Reed Smith (1,038)
(Pittsburgh)
Partners $305-$725 (average $492) (median $480)
Associates $170-$630 (average $309) (median $295)
Firmwide (average $322) (median $310)
Robinson & Cole (217)
(Hartford, Conn.)
Partners $270-$550 (average $400) (median $400)
Associates $175-$400 (average $235) (median $240)
Firmwide (average $316) (median $320)
Roetzel & Andress (208)
(Akron, Ohio)
Partners $200-$425 (average $255) (median $275)
Associates $150-$275 (average $180) (median $190)
Firmwide (average $225) (median $235)
Rutan & Tucker (140)
(Costa Mesa, Calif.)
Partners $310-$515
Associates $200-$335
STU
Saul Ewing (238)
(Philadelphia)
Partners $290-$700 (average $402) (median $395)
Associates $185-$440 (average $258) (median $235)
Firmwide (average $336) (median $345)
Schnader Harrison Segal & Lewis (174)
(Philadelphia)

Partners $305-$650
Associates $155-$295
Schulte Roth & Zabel (449)
(New York)
Partners $580-$800 (average $672) (median $675)
Associates $225-$550 (average $410) (median $393)
Seward & Kissell (142)
(New York)
Partners $460-$695 (average $589) (median $590)
Associates $190-$460 (average $300) (median $290)
Sheppard, Mullin, Richter & Hampton (424)
(Los Angeles)
Partners $415-$650 (average $504)(median $495)
Associates 250-410 (average $342) (median $330)
Firmwide (average $419) (median $420)
Shook, Hardy & Bacon (476)
(Kansas City, Mo.)
Partners $240-$720 (average $374) (median $358)
Associates $190-$405 (average $238) (median $225)
Firmwide (average $291) (median $250)
Shughart Thomson & Kilroy (170)
(Kansas City, Mo.)
Partners $210-$410
Associates $165-$225
Shumaker, Loop & Kendrick (162)
(Toledo, Ohio)
Partners $185-$450 (average $290) (median $290)
Associates $165-$345 (average $205) (median $200)
Firmwide (average $270)
Sills Cummis Epstein & Gross (180)
(Newark, N.J.)
Partners $300-$595
Associates $185-$360
Smith, Gambrell & Russell (191)
(Atlanta)
Partners $275-$550
Associates $150-$330
Snell & Wilmer (448)
(Phoenix)
Partners $265-$625 (average $356)
Associates $160-$360 (average $205)
Firmwide (average $277)
Steptoe & Johnson PLLC (168)
(Clarksburg, W.Va.)
Partners $220-$300
Associates $165-220
Stinson Morrison Hecker (313)
(Kansas City, Mo.)
Partners $230-$495 (average $310) (median $310)
Associates $155-$230 (average $185) (median $180)
Firmwide (average $274) (median $280)
Stoel Rives (345)
(Portland, Ore.)
Partners $270-$475 (average $361) (median $360)
Associates $160-$400 (average $242) (median $230)
Firmwide (average $309) (median $320)
Strasburger & Price (182)
(Dallas)

Partners $295-$525
Associates $195-$310
Sullivan & Worcester (192)
(Boston)
Partners $400-$650
Associates $220-$450
Sutherland Asbill & Brennan (477)
(Atlanta)
Partners $350-$845 (average $477) (median $475)
Associates $200-$530 (average $265) (median $265)
Firmwide (average $373) (median $375)
Thacher Proffitt & Wood (313)
(New York)
Partners $525-$775 (average $603) (median $575)
Associates $265-$485 (average $372) (median $355)
Firmwide (average $430) (median $420)
Thompson Coburn (279)
(St. Louis)
Partners $255-$525 (average $346) (median $345)
Associates $150-$345 (average $208) (median $215)
Firmwide (average $252) (median $255)
Thompson & Knight (388)
(Dallas)
Partners $330-$695 (average $428) (median $450)
Associates $190-$330 (average $265) (median $260)
Firmwide (average $360) (median $380)
Ulmer & Berne (179)
(Cleveland)
Partners $230-$430 (average $303)
Associates $150-$280 (average $202)
Firmwide (average $250)
VW
Vedder, Price, Kaufman & Kammholz (233)
(Chicago)
Partners $315-$560 (average $406) (median $400)
Associates $190-$410 (average $258) (median $255)
Firmwide (average $339) (median $340)
Whiteford, Taylor & Preston (155)
(Baltimore)
Partners $330-$480 (average $401) (median $400)
Associates $295-$345 (average $278) (median $295)
Firmwide (average $364) (median $370)
Wiggin & Dana (144)
(New Haven, Conn.)
Partners $276-$510
Associates $185-$355
Wiley Rein & Fielding (268)
(Washington)
Partners $375-$700 (average $475) (median $465)
Associates $225-$395 (average $300) (median $300)
Firmwide (average $395) (median $395)
Williams Mullen (244)
(Richmond, Va.)
Partners $225-$550
Associates $160-$290
Winstead Sechrest & Minick (286)
(Dallas)
Partners $325-$595

Associates $195-$370
Winston & Strawn (879)
(Chicago)
Partners $365-$800 (average $513.17) (median $510)
Associates $190-$605 (average $328.57) (median $325)
Firmwide (average $357.65) (median $360)
Womble Carlyle Sandridge & Rice (520)
(Winston-Salem, N.C.)
Partners $250-$550 (average $370) (median $400)
Associates $180-$340 (average $254) (median $250)
Firmwide (average $350) (median $350)
Wyatt, Tarrant & Combs (224)
(Louisville, Ky.)
Partners $225-$400 (average $322) (median $320)
Associates $170-$275 (average $207) (median $190)
Firmwide (average $285) (median $290)
12/11/2006 NLJ S2, (Col. 1)
END OF DOCUMENT

Copyright (C) 2007 The New York Law Pub. Co.

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**CENTER FOR BIOLOGICAL**
**DIVERSITY, et al.,**

            **Plaintiffs,**

                **v.**                                           **Civil Action No.  04-0156 (JDB)**

**GALE NORTON,**

            **Defendant.**

## ORDER

Following the successful outcome of this "deadline" case under Section 4 of the

Endangered Species Act ("ESA"), and an unsuccessful attempt to resolve the issue of fees and

costs, plaintiffs have moved for an award of $38,108.88 in attorneys' fees and costs.[1]  Defendant

has opposed the motion, arguing instead that the fee award should be reduced by over 75% to

$8,726.22, which defendant maintains is at the "high end" of fee awards in Section 4 cases.  The

Court agrees that some reduction is appropriate, but rejects the bulk of defendant's objections.

Plaintiffs prevailed on their claims that defendant violated the ESA by failing to designate

critical habitat for the Hine's emerald dragonfly, and obtained a settlement agreement requiring

defendant to designate critical habitat for the species by a date certain.  The agreement provided

plaintiffs with what effectively was full substantive relief, recognized that plaintiffs are prevailing

parties and that defendant would pay plaintiffs reasonable attorneys' fees and costs, but reserved

---

[1]  That total includes plaintiffs' "fees on fees":  that is, fees and costs that are attributable to
plaintiffs' work on the motion for fees and costs.

the amount of fees and cost.  When discussions did not resolve that issue, plaintiffs' motion
followed.

Plaintiffs are entitled to reasonable attorneys' fees and costs under the settlement
agreement and the law.  See 16 U.S.C. § 1540(g)(4); Ruckelshaus v. Sierra Club, 463 U.S. 680,
689, 694 (1983).  The parties agree that the appropriate fee award is to be determined under the
lodestar method of multiplying the number of hours reasonably expended by a reasonable hourly
rate.  See Blanchard v. Bergeron, 489 U.S. 87, 94 (1989); Nat'l Ass'n of Concerned Veterans v.
Sec'y of Defense, 675 F.2d 1319, 1323 (D.C. Cir. 1982); see also Role Models America, Inc. v.
Brownlee, 353 F.3d 962, 968 (D.C. Cir. 2004); Save Our Cumberland Mountains v. Hodel, 857
F.2d 1516, 1522-24 (D.C. Cir. 1988).  Fee applicants bear the burden of presenting well-
documented claims justifying the reasonableness of the hourly rate claimed and the hours worked.
See Role Models, 353 F.3d at 970; Covington v. District of Columbia, 57 F.3d 1101, 1105-10
(D.C. Cir. 1995); Concerned Veterans, 675 F.2d at 1323-27.  Courts must review fee applications
carefully to ensure that taxpayers only reimburse prevailing parties for reasonable fees and
expenses that contributed to the results achieved, see Role Models, 353 F.3d at 970; Am.
Petroleum Inst. v. EPA, 72 F.3d 907, 912 (D.C. Cir. 1996), and that appropriate deductions are
made for excessive or duplicative hours, see, e.g., In re Mullins, 84 F.3d 459, 467-68 (D.C. Cir.
1996); In re North, 59 F.3d 184, 189 (D.C. Cir. 1995).

The Court notes that plaintiffs have exercised billing judgment by reducing their fee
application by 10% and by not seeking fees for certain tasks (e.g., the first 60-day notice).
Nonetheless, the Court concludes under the legal standards referenced above that additional
modest deductions are appropriate to delete certain hours, to reduce the hourly rate for one

attorney, and to increase the across-the-board percentage reduction.  The explanation, in brief, of the Court's conclusions is as follows:

1.    Although the parties appear to disagree on the number of hours expended on preparing plaintiffs' second 60-day notice, the Court concludes that the duplication of effort in the two 60-day notices, and particularly the fact that plaintiffs probably should have realized the need for a more expanded second notice _before_ the complaint and first notice were filed, warrants a deduction of five hours of Mr. Plater's time.

2.    The compilation of regional listing data on other species through 16 hours of attorney time was, the Court concludes, of only marginal relevance to this action, and six hours of Mr. Plater's time on that effort will be deducted.

3.    Such inefficiencies, together with several other objections raised by defendant, warrant an additional 5% across-the-board reduction in the fee award (on top of the 10% reduction reflecting plaintiffs' sound billing judgment).  The Court's concerns include the relative simplicity and early settlement of this case; the time (12.4 hours) spent reviewing what was identified by plaintiffs' counsel as the administrative record but was apparently materials received

under FOIA; the inefficiency caused by having two separate

out-of-town counsel (although the Court is not convinced

that any greater or more specific reduction is appropriate for

this fact); and the generality (and hence lack of required

specificity) of several billing entries (although, again, no

further reduction is warranted).  An across-the-board

percentage reduction is justified when a court determines

that the total claim is unreasonable.  See Democratic Cent.

Comm. v. Washington Metro. Area Transit Comm'n, 12

F.3d 269, 272 (D.C. Cir. 1994).

4.    On the other hand, the Court concludes that no deduction on

the fee application is warranted for defendant's objections

based on the travel to and research at several dragonfly

habitats, which was a reasonable expenditure of attorney

time; the time spent drafting the complaint, which also was

reasonable; or the time spent working on the case after

defendant's offer of judgment, which appears to be largely

reasonable settlement and fee litigation time that is not

precluded by an offer of judgment pursuant to Fed.R.Civ.P.

68.[2]

---

[2] Defendant has made no effort to differentiate between fees that might be precluded and those that clearly are not.

5.        Finally, defendants object to the $220 hourly rate claimed by

Mr. Plater.  The Court concludes that the objection is well-

taken, and that the materials submitted by plaintiffs only

support a $180 hourly rate for Mr. Plater under the 2003

Laffey matrix[3] because he had three (rather than four) years

experience during the relevant period.  The Court declines

plaintiffs' undeveloped last-minute requests to "adjust all

hours upward based on the consumer price index" and then

"consider further upward adjustments based on Mr. Plater's

expertise and the cost of living in San Francisco, CA."  Pls.'

Reply Mem. at 15.  The hourly rate for Mr. Plater will be

adjusted to $180 before the across-the-board 5% reduction

discussed above.

Accordingly, based on the entire record, the Court will award $28,850.63 in attorney's fees

and costs.  That award consists of 132.8 hours[4] for Mr. Plater at $180/hour ($23,904.00) and 18.3

hours[5] for Mr. Ukeiley at $270/hour ($4941.00), reduced by 5% to $27,402.75, plus costs of

$1447.88.

---

[3]  Both parties have relied on the Laffey matrix to determine the reasonable hourly rate.

[4]  This figure includes 131.2 hours for work performed prior to the reply to the fee petition, plus 12.6 hours for work on the reply (both of these numbers already incorporate the initial 10% reduction), minus the 11.0 hours excluded by this Order.

[5]  This figure includes 16.7 hours for work performed prior to the reply to the fee petition, plus 1.6 hours for work on the reply (both of these numbers already incorporate the initial 10% deduction).

-5-

SO ORDERED.


                                       _____/s/ John D. Bates_____

                                            JOHN D. BATES

                                   United States District Judge


Dated:    __January 26, 2005__

Copies to:

Robert Steven Ukeiley
507 Center Street
Berea, KY 40403
(859) 986-5402
Fax : (859) 986-2695
Email: rukeiley@igc.org

Brent Plater
Center for Biological Diversity
370 Grand Avenue
Suite 5
Oakland, CA 94610
(510) 663-0616
Fax : (510) 663-0272
E-mail: bplater@biologicaldiversity.org

Coby Howell
AARP Foundation Litigation
601 E Street, NW
Washington, DC 20049
(202) 305-0201
Fax : (202) 305-0275
Email: coby.howell@usdoj.gov

# EXHIBIT C

Robert Ukeiley, P.S.C

# Invoice

435R Chestnut Street
Suite 1
Berea, KY 40403

| DATE | INVOICE # |
|------|-----------|
| 7/5/2007 | 203 |

| BILL TO |
|---------|
|  |

| DUE DATE | PROJECT |
|----------|---------|
| 8/4/2007 | Ft. St. Vrain |

| DATE | TIME | ACTION | DESCRIPTION | RATE | AMOUNT |
|------|------|--------|-------------|------|--------|
| 8/15/2005 | 0.5 | Doc Review | Robert Ukeiley (RU): review Ft. St. Vrain petition and draft Notice of Intent to Sue letter. E-mail to Jeremy Nichols (Jeremy) re: same. | 360.00 | 180.00 |
| 10/10/2005 | 0.4 | Doc Review | RU: review draft notice of intent to sue letter. E-mail to Jeremy re: same. | 360.00 | 144.00 |
| 2/19/2006 | 0.1 | E-mail | RU: E-mail from Jeremy re: decision to sue. E-mail to Brian Litmans, (Brian) public interest environmental lawyer seeing if he would take case. | 360.00 | 36.00 |
| 2/27/2006 | 0.1 | E-mail | RU: E-mail from Jeremy re: status of EPA's response to petition. | 360.00 | 36.00 |
| 3/9/2006 | 0.3 | E-mail | RU: E-mails w/Brian and Jeremy re: strategy. Sent Brian docs from previous case. | 360.00 | 108.00 |
| 5/7/2006 | 0.1 | E-mail | RU: E-mail to Jeremy and Brian re: status. | 360.00 | 36.00 |
| 5/10/2006 | 0.2 | E-mail | RU: E-mails w/Brian and Jeremy re: status. | 360.00 | 72.00 |
| 10/18/2006 | 0.3 | T/C & Meeting | RU: Meeting w/Aubrey, re: status. | 375.00 | 112.50 |
|  | 0.3 | T/C & Meeting | Aubrey Baldwin (AB): Meeting w/Robert Ukeiley (Robert), re: status. | 205.00 | 61.50 |
| 10/30/2006 | 0.4 | Legal Writing | AB: complaint | 205.00 | 82.00 |
| 11/8/2006 | 0.4 | Legal Writing | AB: complaint | 205.00 | 82.00 |
| 11/9/2006 | 4.6 | Legal Writing | AB: complaint | 205.00 | 943.00 |
| 11/10/2006 | 1.1 | E-mail | AB: to client re: timing of petition and EPA review, request necessary docs, proposed permit. To RU re: proposed permit. | 205.00 | 225.50 |
| 11/13/2006 | 1.2 | Legal Writing | AB: complaint. E-mail to client re: proposed permit. | 205.00 | 246.00 |
| 11/14/2006 | 0.3 | Legal Writing | AB: review and edit complaint. | 205.00 | 61.50 |
|  | 0.5 | Legal Writing | RU: edit complaint. | 375.00 | 187.50 |
| 11/15/2006 | 0.7 | Doc Review | AB: complaint. E-mail client re: proposed permit. | 205.00 | 143.50 |
| 11/16/2006 | 0.2 | Legal Writing | RU: edit complaint. | 375.00 | 75.00 |
| 11/20/2006 | 0.1 | Legal Writing | AB: prepare complaint and papers for filing. | 205.00 | 20.50 |
| 11/26/2006 | 0.1 | Doc Review | RU: reviewed filings. | 375.00 | 37.50 |

| | Total |
|--|-------|
| | |

Robert Ukeiley, P.S.C

# Invoice

435R Chestnut Street
Suite 1
Berea, KY 40403

| DATE | INVOICE # |
|------|-----------|
| 7/5/2007 | 203 |

**BILL TO**

| DUE DATE | PROJECT |
|----------|---------|
| 8/4/2007 | Ft. St. Vrain |

| DATE | TIME | ACTION | DESCRIPTION | RATE | AMOUNT |
|------|------|--------|-------------|------|--------|
| 12/19/2006 | 0.1 | Doc Review | RU: reviewed executed, filed summons, forward to Jeremy and Aubrey. | 375.00 | 37.50 |
| | 0.1 | Doc Review | AB: executed, filed summons and sent to assigned EPA Office of General Counsel lawyer. | 205.00 | 20.50 |
| 1/16/2007 | 0.1 | E-mail | RU: e-mail to Eric Hostetler. US DOJ Environmental Defense Section and Apple Chapman (Apple), EPA Office of General Counsel re: who is DOJ assigned attorney and EPA's interest in settlement. | 375.00 | 37.50 |
| 1/17/2007 | 0.2 | E-mail | RU: e-mail from Apple re: assigned attorney and settlement. Meeting w/Aubrey re: same. | 375.00 | 75.00 |
| | 0.1 | T/C & Meeting | AB: meeting w/Robert re: assigned attorney. | 205.00 | 20.50 |
| 1/18/2007 | 0.1 | T/C & Meeting | AB: Eileen McDonough re: settlement position. | 205.00 | 20.50 |
| 1/19/2007 | 0.2 | T/C & Meeting | AB: Eileen McDonough re: settlement position. T/c w/client re: same. | 205.00 | 41.00 |
| 1/23/2007 | 0.2 | E-mail | AB: w/client re: strategy. | 205.00 | 41.00 |
| 2/1/2007 | 0.5 | T/C & Meeting | AB: Eileen McDonough re: EPA settlement position, meeting w/RU re: same, call to client re: same. | 205.00 | 102.50 |
| 2/5/2007 | 0.3 | Doc Review | AB: Answer | 205.00 | 61.50 |
| | 0.4 | T/C & Meeting | AB: Eileen McDonough re EPA settlement position, meeting w/RU re: same, call to client re: same. | 205.00 | 82.00 |
| | 0.2 | T/C & Meeting | RU: Meeting w/Aubrey re: Answer, response. | 375.00 | 75.00 |
| 2/8/2007 | 0.2 | Doc Review | AB: review order for 26(f) conference. | 205.00 | 41.00 |
| 2/13/2007 | 0.4 | T/C & Meeting | OGC attys re: 26(f) conference, settlement, stipulated partial dismissal. T/C w/David Orlin, EPA OGC re GCC Dacotah consent decree schedule. | 205.00 | 82.00 |
| 2/20/2007 | 0.8 | Doc Review | AB: received proposed consent decree from DOJ, reviewed and edited same. | 205.00 | 164.00 |
| 2/21/2007 | 0.4 | Legal Writing | RU: edit consent decree. e-mail to Aubrey w/Notes. | 375.00 | 150.00 |

| | **Total** | |
|---|-----------|---|

Robert Ukeiley, P.S.C

435R Chestnut Street
Suite 1
Berea, KY 40403

# Invoice

| DATE | INVOICE # |
|------|-----------|
| 7/5/2007 | 203 |

| BILL TO |
|---------|
|  |

| DUE DATE | PROJECT |
|----------|---------|
| 8/4/2007 | Ft. St. Vrain |

| DATE | TIME | ACTION | DESCRIPTION | RATE | AMOUNT |
|------|------|--------|-------------|------|--------|
|  | 0.2 | E-mail | AB: DOJ and EPA OGC re: changes to draft consent decree. | 205.00 | 41.00 |
| 2/23/2007 | 0.1 | Doc Review | AB: Order setting March 13, 2007 conference. | 205.00 | 20.50 |
| 2/26/2007 | 1.1 | E-mail | AB: Review e-mail from DOJ re: revised consent decree, reviewed same, meeting with Robert Ukeiley re: same, e-mailed DOJ re same. Reviewed motion to cancel conference, meeting w/Robert re: same. | 205.00 | 225.50 |
| 3/9/2007 | 0.1 | Doc Review | AB: Review order granting vacation of status conference. | 205.00 | 20.50 |
|  | 0.1 | Doc Review | RU: Review order granting vacation of status conference.  E-mail same to Aubrey. | 375.00 | 37.50 |
| 3/22/2007 | 0.2 | Doc Review | RU: Review Federal Register (FR) notice re: EPA response to Ft. St. Vrain Title V petition. | 375.00 | 75.00 |
|  | 0.2 | Doc Review | AB: Ft. St. Vrain FR notice, e-mail to client re: same. | 205.00 | 41.00 |
| 3/26/2007 | 0.6 | Doc Review | AB: Reviewed signed consent decree, meeting w/RU re: same, signed and returned consent decree. | 205.00 | 123.00 |
| 3/27/2007 | 0.2 | Legal Writing | AB: Preparation of Settlement Offer on fees. | 205.00 | 41.00 |
| 3/30/2007 | 0.7 | Research | AB: Fees in the DC Circuit. | 205.00 | 143.50 |
|  | 2.6 | Doc Review | AB: Review e-mail from Eileen McDonough re: fees.  Response to Eileen McDonough e-mail re: fee settlement offer. | 205.00 | 533.00 |
| 3/31/2007 | 0.4 | E-mail | RU: E-mail Aubrey re: position on fees. | 375.00 | 150.00 |
| 4/2/2007 | 0.5 | E-mail | AB: From Eileen McDonough re: fees, response to same. | 205.00 | 102.50 |
| 4/5/2007 | 0.1 | Doc Review | RU: Review FR notices on proposed consent decree. | 375.00 | 37.50 |
| 4/6/2007 | 0.2 | Legal Writing | AB: Response to Eileen McDonough re: settlement offer. | 205.00 | 41.00 |
| 4/9/2007 | 0.3 | Doc Review | RU: Review brief in ESA dragonfly case on fees in DDC. E-mail and meeting w/Aubrey re: response. | 375.00 | 112.50 |

| | Total |
|-|-------|
| | |

Robert Ukeiley, P.S.C

435R Chestnut Street
Suite 1
Berea, KY 40403

# Invoice

| DATE | INVOICE # |
|------|-----------|
| 7/5/2007 | 203 |

| BILL TO |
|---------|
|         |

| DUE DATE | PROJECT |
|----------|---------|
| 8/4/2007 | Ft. St. Vrain |

| DATE | TIME | ACTION | DESCRIPTION | RATE | AMOUNT |
|------|------|--------|-------------|------|--------|
| | 0.2 | E-mail | AB: E-mail Eileen re: fee settlement, meeting w/RU re: response. | 205.00 | 41.00 |
| 5/7/2007 | 0.6 | Doc Review | AB: EPA consent decree docket. Prepare draft motion to enter consent decree. E-mail to Eileen McDonough, David Orlin, and Elyana Sutin re: same. | 205.00 | 123.00 |
| 5/8/2007 | 0.8 | E-mail | AB: From Eileen re: settlement offer. Review motion to enter consent decree. | 205.00 | 164.00 |
| 5/10/2007 | 1.2 | Legal Writing | AB: Preparation of response to DOJ re: fee settlement offer. | 205.00 | 246.00 |
| | 0.5 | E-mail | AB: Review e-mail from Eileen. Meeting w/Robert Ukeiley re: same. | 205.00 | 102.50 |
| | 0.4 | Doc Review | RU: Review e-mails from Eileen and Aubrey re: fees. Meeting w/Aubrey re: same. | 375.00 | 150.00 |
| 5/11/2007 | 0.1 | E-mail | AB: To Eileen McDonough with Counteroffer to DOJ Counteroffer on fees. | 205.00 | 20.50 |
| 5/12/2007 | 0.3 | Doc Review | RU: Reviewed changes to consent decree. E-mail to Aubrey re: same. | 375.00 | 112.50 |
| 5/14/2007 | 0.2 | E-mail | AB: E-mail to Eileen re: consent to file motion to enter modified consent decree. | 205.00 | 41.00 |
| 5/18/2007 | 0.2 | Doc Review | RU: Review signed consent order. E-mail w/Jeremy Nichols re: same. | 375.00 | 75.00 |
| 6/15/2007 | 0.1 | E-mail | RU: E-mail to Eileen re: whether EPA signed the petition response. E-mails with Jeremy re: same. | 375.00 | 37.50 |
| | 0.1 | E-mail | RU: E-mail from Eileen re: signing and returning the petition response, forward same to Jeremy. | 375.00 | 37.50 |
| 6/28/2007 | 0.6 | Doc Review | RU: Review order granting and denying GCC Dacotah Title V petition. E-mail to Jeremy re: same. | 375.00 | 225.00 |
| | 0.3 | Doc Review | RU: Review status of fees settlement negotiations. E-mail to Eileen re: same. | 375.00 | 112.50 |
| 7/5/2007 | 0.2 | Doc Review | RU: Reviewed stipulation re: entitlement and costs. E-mail to Eileen re: same. | 375.00 | 75.00 |

| | Total |
|---|-------|
| | |

Robert Ukeiley, P.S.C

435R Chestnut Street
Suite 1
Berea, KY 40403

# Invoice

| DATE | INVOICE # |
|------|-----------|
| 7/5/2007 | 203 |

| BILL TO |
|---------|
|  |

| DUE DATE | PROJECT |
|----------|---------|
| 8/4/2007 | Ft. St. Vrain |

| DATE | TIME | ACTION | DESCRIPTION | RATE | AMOUNT |
|------|------|--------|-------------|------|--------|
|  | 0.2 | Doc Review | RU: Reviewed Federal Register notice regarding EPA decision on GCC Dacotah petition. E-mail to Jeremy re: same | 375.00 | 75.00 |
|  | 4.3 | Legal Writing | Liz Middleton (LM): Cite check brief | 120.00 | 516.00 |
| 7/8/2007 | 0.1 | Doc Review | RU: Reviewed filed stipulation re: entitlement and costs. E-mail to Jeremy re: same | 375.00 | 37.50 |
| 7/12/2007 | 1.4 | Legal Writing | RU: Draft motion for fees | 375.00 | 525.00 |
| 7/13/2007 | 3.2 | Legal Writing | RU: edit motion for fees | 375.00 | 1,200.00 |
|  | 1 | Legal Writing | RU: edit affidavit in support of motion for fees | 375.00 | 375.00 |
|  | 0.2 | Legal Writing | RU: edit purposed order in support of motion for fees | 375.00 | 75.00 |
|  | 0.3 | Legal Writing | RU: edit billing statement to exercise billing discretion | 375.00 | 112.50 |
|  | 2.3 | Legal Writing | LM: Proofread brief | 120.00 | 276.00 |

| Total | $10,441.50 |
|-------|-----------|

# EXHIBIT D



# UNITED STATES ATTORNEY'S OFFICE
## FOR THE DISTRICT OF COLUMBIA

555 4TH STREET, NW
WASHINGTON, DC 20530
(202) 514-7566

SEARCH

HOME

U.S. ATTORNEY

ABOUT US

DIVISIONS

COMMUNITY PROSECUTION

PROGRAMS FOR YOUTH

VICTIM WITNESS ASSISTANCE

PARTNERSHIPS

PRESS RELEASES

EMPLOYMENT

ESPAÑOL

CONTACT US

LINKS

SITE MAP

## LAFFEY MATRIX 2003- 2007

| Experience | 03-04 | 04-05 | 05-06 | 06-07 |
|---|---|---|---|---|
| 20+ years | 380 | 390 | 405 | 425 |
| 11-19 years | 335 | 345 | 360 | 375 |
| 8-10 years | 270 | 280 | 290 | 305 |
| 4-7 years | 220 | 225 | 235 | 245 |
| 1-3 years | 180 | 185 | 195 | 205 |
| Paralegals & Law Clerks | 105 | 110 | 115 | 120 |

Years (Rate for June 1 - May 31, based on prior year's CPI-U)

**Explanatory Notes**

1. This matrix of hourly rates for attorneys of varying experience levels and paralegals/law clerks has been prepared by the Civil Division of the United States Attorney's Office for the District of Columbia. The matrix is intended to be used in cases in which a "fee-shifting" statute permits the prevailing party to recover "reasonable" attorney's fees. *See, e.g.,* 42 U.S.C. § 2000e-5(k) (Title VII of the 1964 Civil Rights Act); 5 U.S.C. § 552(a)(4)(E) (Freedom of Information Act); 28 U.S.C. § 2412 (b) (Equal Access to Justice Act). The matrix does not apply in cases in which the hourly rate is limited by statute. See 28 U.S.C. § 2412(d).

2. This matrix is based on the hourly rates allowed by the District Court in *Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354 (D.D.C. 1983), *aff'd in part, rev'd in part on other grounds*, 746 F.2d 4 (D.C. Cir. 1984), *cert. denied*, 472 U.S. 1021 (1985). It is commonly referred to by attorneys and federal judges in the District of Columbia as the "Laffey Matrix" or the "United States Attorney's Office Matrix." The column headed "Experience" refers to the years following the attorney's graduation from law school. The various "brackets" are intended to correspond to "junior associates" (1-3 years after law school graduation), "senior associates" (4-7 years), "experienced federal court litigators" (8-10 and 11-19 years), and "very experienced federal court litigators" (20 years or more). *See Laffey*, 572 F. Supp. at 371.

3. The hourly rates approved by the District Court in *Laffey* were for work done principally in 1981-82. The Matrix begins with those rates. *See Laffey*, 572 F. Supp. at 371 (attorney rates) & 386 n.74 (paralegal and law clerk rate). The rates for subsequent yearly periods were determined by adding the change in the cost of living for the Washington, D.C. area to the applicable rate for the prior year, and then rounding to the nearest multiple of $5 (up if within $3 of the next multiple of $5). The result is subject to adjustment if appropriate to ensure that the relationship between the highest rate and the lower rates remains reasonably constant. Changes in the cost of living are measured by the Consumer Price Index for All Urban

Consumers (CPI-U) for Washington-Baltimore, DC-MD-VA-WV, as announced by the Bureau of Labor Statistics for May of each year.

4.  Use of an updated *Laffey* Matrix was implicitly endorsed by the Court of Appeals in *Save Our Cumberland Mountains v. Hodel*, 857 F.2d 1516, 1525 (D.C. Cir. 1988) (en banc). The Court of Appeals subsequently stated that parties may rely on the updated *Laffey* Matrix prepared by the United States Attorney's Office as evidence of prevailing market rates for litigation counsel in the Washington, D.C. area. See *Covington v. District of Columbia*, 57 F.3d 1101, 1105 & n. 14, 1109 (D.C. Cir. 1995), *cert. denied*, 516 U.S. 1115 (1996). Lower federal courts in the District of Columbia have used this updated *Laffey* Matrix when determining whether fee awards under fee-shifting statutes are reasonable. *See, e.g., Blackman v. District of Columbia*, 59 F. Supp. 2d 37, 43 (D.D.C. 1999); *Jefferson v. Milvets System Technology, Inc.*, 986 F. Supp. 6, 11 (D.D.C. 1997); *Ralph Hoar & Associates v. Nat'l Highway Transportation Safety Admin.*, 985 F. Supp. 1, 9-10 n.3 (D.D.C. 1997); *Martini v. Fed. Nat'l Mtg Ass'n*, 977 F. Supp. 482, 485 n.2 (D.D.C. 1997); *Park v. Howard University*, 881 F. Supp. 653, 654 (D.D.C. 1995).

**Last Updated on 07/13/2006**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROCKY MOUNTAIN CLEAN AIR          )
ACTION, et al.,                    )
                                   )
              Plaintiffs,          )
                                   )
       v.                          )        Civil Action No. 06-01992 (JR)
                                   )
STEPHEN L. JOHNSON,                )
Administrator, United States       )
Environmental Protection           )
Agency                             )
                                   )
              Defendant.           )
_____)

**[proposed] ORDER**

Before the Court is Plaintiffs' Motion for Award of Attorneys' Fees and Costs

("Motion"). The Motion has been fully briefed. The Court finds and concludes that this

is another Title V petition deadline case in which Defendant, the Administrator of the

United States Environmental Protection Agency, has violated the Congressional

mandated 60-day deadline for responding to petitions seeking objections to Clean Air Act

Title V permits. This mandatory duty is found in 42 U.S.C. § 7661d(b)(2). EPA has a

disturbing  propensity to violate this mandatory duty until the Court's jurisdiction is

invoked pursuant to the Clean Air Act's so called citizen suit provision. See 42 U.S.C. §

7604(a)(2). See also, e.g. New York Public Interest Research Group v. Whitman, 214 F.

Supp. 2d 1, 2 (D.D.C. 2002); Center for Biological Diversity v. Johnson, 06-CV-1350

(GK); Rocky Mountain Clean Air Action v. Johnson, 1:06-cv-01419-RMC; Idaho

Conservation League v. Johnson, 1:07-cv-00396-RBW.

[proposed] ORDER -- 1

In this case, Plaintiffs sought and obtained orders responding to their petitions for objections to the Clean Air Act Title V permits for the Ft. St. Vrain power plant in Colorado and the GCC Dacotah cement manufacturing plant in South Dakota, which Defendant had failed to provide in violation of 42 U.S.C. § 7661d(b)(2). Thus, having obtained all the relief they were seeking in this deadline suit, Plaintiffs are entitled to costs of litigation, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 7604(d). The parties have stipulated to as much.

In determining the reasonable attorneys' fees, the Court employees the loadstar method of multiply the reasonable hourly rate for attorneys and professional staff times the reasonable billable hours expended. As to the reasonable rate, the Court finds that the rates provided in the U.S. Attorney's Office's revised Laffey Matrix are appropriate. Davis County Solid Waste Mgmt. v. EPA, 169 F.3d 755, 758 (D.C. Cir. 1999) has no applicability to the present case because Plaintiffs' counsel in this case bill at or reasonably close to the Laffey Matrix rates for matters that they have not chosen to provide *pro bono* representation. Furthermore, because Plaintiffs' counsel represented Plaintiffs in this case on a *pro bono* basis with charging anything for their time, there is no chance that the Plaintiffs will receive an extreme windfall from the difference between the price they contracted to pay their attorneys and the amount they are awarded by this Court.

As to the reasonable number of hours, Plaintiffs' requested hours, especially in light of their reduction of 15% as an exercise of billing discretion, are reasonable. The Court notes that the total of less than $9,300 is very reasonable for the work done in this case.

[proposed] ORDER -- 2

Therefore it is hereby ORDERED that Plaintiffs' Motion is GRANTED.  It is

hereby FURTHER ORDERED that Defendant shall promptly pay Plaintiff $9,229.78

plus [cost of reply briefing] for the costs of litigation, including attorneys' fees.

SO ORDERED THIS ___ DAY OF _____, 2007.


_____
JAMES ROBERTSON
United States District Judge

[proposed] ORDER -- 3